**In re THE BIBLE SPEAKS, Debtor.**

**Bankruptcy No. 86–40392–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

Jan. 15, 1987.

See also, Bkrtcy., 69 B.R. 72.

Norman Roy Grutman, Grutman, Miller, Greenspoon & Hendler, New York City, Charles W. Morse, Jr., Sullivan & Worcester, Boston, Mass., for The Bible Speaks.

Joyce Kirby, Asst. Counsel, Boston, Mass., for Bd. of Regents of Higher Educ. of the Commonwealth.

## MEMORANDUM

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

The Debtor is a non-profit religious and educational organization. It operates two educational facilities: one for children in kindergarten through the twelfth grades, and one for adults known as The Stevens School of The Bible. The Debtor moves that an order be issued directing the Agent for Veteran Affairs of the Massachusetts Board of Regents of Higher Education (the "Board") to show cause why the Board should not be enjoined from withdrawing its approval of The Stevens School of The Bible (the "School") as one whose veteran students are eligible to receive veterans' benefits under 38 U.S.C. § 1776. No objection having been made to the Debtor seeking such relief by way of a motion rather than a complaint, *see* BANKR.R. 7001, we proceed to the merits.

Veterans may receive educational benefits from the federal government in either one of two ways. They may take so-called "accredited courses," primarily those of an institution whose courses have been accredited by a nationally recognized accrediting

agency, and thereby become eligible for benefits provided that the institution satisfies rather minimal statutory requirements.[1] They may, on the other hand, take courses which have not been accredited by a nationally recognized accrediting agency, if the institution providing such courses meets much more detailed criteria.[2] The present question involves approval of non-accredited courses offered by the School. The Board acts as the designated[3] state approving agency for the federal government.

The Debtor filed a voluntary petition seeking reorganization under Chapter 11 (11 U.S.C. § 1101 *et seq.*) on July 29, 1986. By letter dated August 8, 1986, the United States Veterans Administration wrote to the Board informing it that the Debtor had "petitioned for bankruptcy." It requested the Board to investigate to determine whether the School continued to meet the requirements of 38 U.S.C. 1776(c)(9) that the "institution is financially sound and capable of fulfilling its commitments for training." The Board's Agent for Veteran Affairs visited the School on August 14th. During that visit, he reminded the School's president of the statutory financial requirement, and "requested financial data to show future finances and an ability to meet the School's commitments for training." Having received no further information, the Board sent the School a letter dated August 20th stating that the Board had suspended approval of the School, and that approval would be completely withdrawn if "proof of the school's financial stability" was not provided within 60 days. On August 26th, the Debtor's counsel wrote to the Board, stating in part: "The Debtor has available to it potential sources of additional funds from the sale of surplus real estate that should enable it to emerge from Chapter 11 reorganization, hopefully within

a period of a year to 18 months from this date." That letter also enclosed a statement of the Debtor's pastor, dated July 30, 1986, which disclosed in some detail that the cause of the Chapter 11 filing was a disputed $7 million claim of a former contributor. The statement asserted that the claim was without merit and that the Debtors' assets were more than sufficient to pay its liabilities exclusive of this disputed claim.

The Board responded to counsel that these documents did not provide sufficient information to establish that the School "is financially sound." The Board informed counsel that any additional financial documents would be carefully reviewed before a final decision was made on October 20th to either reinstate or withdraw approval. Although the parties had telephone conversations thereafter, for some unexplained reason the Debtor furnished no further written financial information to the Board. On October 20th, the Board informed the school that its approval was withdrawn "because the school is not financially stable."

The Debtor contends that the Board's application of 38 U.S.C. § 1776(c)(9) amounts to a determination that any debtor who files a bankruptcy petition is *ipso facto* financially unsound. The Debtor argues that Congress has expressed a policy against such actions in 11 U.S.C. § 365(e), which invalidates *ipso facto* clauses in executory contracts. The Debtor asks that the Court use its equitable powers under 11 U.S.C. § 105(a) to enjoin the Board's withdrawal of approval. The Board argues that it did not act because of the Debtor's Chapter 11 petition, but rather because of the Debtor's financial condition, and then only in a nondiscriminatory manner by applying the same standards which it would

---

**1.** 38 U.S.C. § 1775.

**2.** 38 U.S.C. § 1776. The school must apply to the State Approving Agency for approval. The Agency may only approve the school and its courses if the school meets certain objective criteria, such as detailed recordkeeping and compliance with state, local and federal codes

and regulations, and if the agency determines that the school meets other, more subjective standards, such as financial soundness and retaining personnel with "good reputation and character." *See* 38 U.S.C. § 1776(c).

**3.** *See* 38 U.S.C. § 1771.

apply to a school that was not in a bankruptcy proceeding. As proof of this, the Board points to its sustained efforts to obtain financial information concerning the Debtor beyond the mere fact of the Debtor's Chapter 11 petition. We hold that, even so, the Board's action was not permissible. We base our decision upon 11 U.S.C. § 525(a), a statute not relied upon by the Debtor.

11 U.S.C. § 525(a) provides as follows:

Except as provided in the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. 181–229), and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C. 402), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

■ We conclude that the Board is a "governmental unit," *see* 11 U.S.C. § 101(24), and that its revocation of approval of the School for veterans' benefits purposes constitutes the revocation of "a license, permit, charter, franchise, or other similar grant ... solely because ... [the Debtor] ... has been insolvent ... during the case ..." within the meaning of Section 525(a) of the Bankruptcy Code.

The terms "license," "permit," "charter" and "franchise" are not defined in 11 U.S.C. § 101. Black's Law Dictionary defines a "license" as "[p]ermission to do a particular thing, to exercise a certain privilege or to carry on a particular business or to pursue a certain occupation." BLACK'S LAW DICTIONARY 829 (5th ed. 1979). A "franchise" is defined as "[a] special privilege conferred by government on individual or corporation, and which does not belong to citizens of country generally of common right [sic]." *Id.* at 592.

Although the "scope of protection represented by these undefined terms has not yet been clarified," *Goldrich v. New York State Higher Education Services Corp. (In re Goldrich)*, 771 F.2d 28, 30 (2d Cir. 1985), the Board's actions here are within the plain language of § 525(a). 38 U.S.C. § 1776 required the School to be the applicant to the Board for certification of its courses. By approving the School, the Board conferred privileges on the school analogous to a license or franchise. After approval, the School had the right to represent to veteran students that the Board had approved its unaccredited courses. The School also obtained assurance that the students' tuition for these courses would be subsidized and therefore more likely to be paid. These privileges are not indirect or tenuous. The School had to apply for them, and subjected itself to the oversight of a government agency in order to continue receiving them. We conclude, therefore, that the privileges in question here are a "similar grant" under § 525(a).[4]

---

4. The legislative history to § 525(a) generally supports an expansive application of the discrimination provisions. *See* H.R.REP. NO. 595, 95th Cong., 1st Sess. 366–67 (1977); S.REP. NO. 989, 95th Cong., 2d. Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787 (expressing a desire for further development though § 525 of the concept of discrimination formulated in *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971)). *But see Goldrich v. N.Y. State Higher Educ. Serv. Corp. (In re Goldrich)*, 771 F.2d 28, 30–31 (2d Cir.1985) (rejecting

The more troublesome issue here is whether the Board's action was discriminatory within the meaning of § 525(a). The statute prohibits certain actions taken by governmental units:

1) solely because the person is or has been a debtor under the Bankruptcy Code;

2) solely because the debtor has been:
 a) insolvent before the petition; or
 b) insolvent after the petition but before grant or denial of discharge; or

3) solely because the debtor has failed to pay a debt dischargeable in the bankruptcy case.

The legislative history of § 525(a) raises problems. The House interpreted the statute to allow a governmental agency to "[examine] the factors surrounding bankruptcy, [impose] financial responsibility rules if they are not imposed only on former bankrupts, or [examine] prospective financial condition or managerial ability." H.R.REP. NO. 595, 95th Cong., 1st Sess. 165 (1977), U.S.Code Cong. & Admin.News 1978, p. 6126. The House believed that discrimination was not present if "the causes of a bankruptcy are intimately connected with the license, grant, or employment in question" and that "an examination into the circumstances surrounding the bankruptcy will permit governmental units to pursue appropriate regulatory policies and take appropriate action without running afoul of bankruptcy policy." *Id.* Both the House and the Senate expressed the view that the statute allowed "consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily." *Id.* at 367; S.REP. NO. 989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5867, 6323.

 This portion of the legislative history conflicts with the plain language of the statute. The actions described in the legislative history, such as "an examination into the circumstances surrounding bank-

ruptcy," examination of "prospective financial conditions," or the imposition of financial responsibility rules, are well within the reach of the language of the statute if motivated solely by the debtor's bankruptcy, insolvency prior to discharge, or failure to pay a dischargeable debt. Although committee reports are an important receptacle of legislative intent, they cannot, as a general rule, be used to replace a legislative intent evident in the words of a statue. 2A SUTHERLAND STATUTORY CONSTRUCTION §§ 48.01, 48.06 (Sands 4th ed. 1984); *see United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 83, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932). In order to overcome an intent expressed in plain language in a statute, contrary legislative history must be "clear" and "convincing." *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.1973); *see Peare v. McFarland,* 778 F.2d 354, 357 (7th Cir.1985).

A reading of these excerpts in the context of the overall legislative history permits a narrow, and more harmonious, interpretation. The statute itself provides for the exemption of agencies applying certain laws, such as an agency enforcing the Perishable Agricultural Commodities Act (7 U.S.C. §§ 499a–499s). *See* 11 U.S.C. § 525(a). Congress, therefore, does allow certain governmental units to operate outside the reach of the statute through specific exceptions. The exceptions within the statute, however, do not fully explain the sweeping language in the committee reports. We are nevertheless convinced that such language does not clearly indicate a contrary intent. Congress did not adopt the proposal of the Commission on the Bankruptcy Laws of the United States. That proposal, although broader in terms of who could not discriminate and of the circumstances when discrimination could occur, would have expressly permitted consideration of the present and future financial condition of the debtor. *See Report on the Comm'n on the Bankruptcy Laws of the United States,* H.R.DOC. NO. 137, 93d

broad application of the statute based on legislative history).

No

Cong., 1st Sess., Pt. II at 143–45 (1973) (proposed § 4–508). We infer from this that Congress rejected any consideration of present or future financial responsibility if such consideration is based *solely* on the debtor's bankruptcy or insolvency.

We read the language in the Committee Reports to indicate the same intent. Although the House Report apparently contemplates an exception as broad as the Commission's proposed statute, the report also emphasizes that the purpose of § 525 is to "prevent an automatic reaction against an individual for availing himself of the protection of the bankruptcy laws." H.R.REP. NO. 595, *supra,* at 165, U.S.Code Cong. & Admin.News 1978, p. 6126. This statement indicates an intent consistent with the statute and reduces the apparent inconsistency with the terms of the statute to a proposed interpretation of the statute. The other language contained in both reports must be read with a similar view. Both the House and the Senate emphasize that § 525(a) is intended only to prohibit "discrimination or other action based solely on the basis" of the debtor's bankruptcy, insolvency, or nonpayment of a dischargeable debt. H.R.REP. NO. 595, *supra,* at 366–67; S.REP. NO. 989, *supra,* at 81, U.S.Code Cong. & Admin.News 1978, pp. 5867, 6322.

▮ Both reports, however, would allow consideration of financial factors or the imposition of requirements related to financial matters "if applied nondiscriminatorily." H.R.REP. NO. 595, *supra,* at 367; S.REP. NO. 989, *supra,* at 81, U.S.Code Cong. & Admin.News 1978, pp. 5867, 6323.

We conclude that this permits action only if there is no discrimination in a § 525(a) sense, i.e., if the financial condition or requirement did not relate to the areas protected by § 525(a) or, if it did relate to such areas, the condition or requirement does not *alone* precipitate the action against the debtor. This is consistent with the statute. It is not consistent with the statute to permit the Board to act based upon a Chapter 11 school's insolvency merely because it takes such action with respect to all schools who are insolvent, whether they are inside or outside of bankruptcy. Such an interpretation preserves the "fresh start" policy of the Bankruptcy Code. It prevents the Debtor's present financial difficulties from being the charter for his future. It also promotes the policy of allowing the Debtor breathing room and a respite from outside pressure.[5] *See* H.R.REP. NO. 595, 95th Cong., 1st Sess. 340 (1977).

▮ We thus conclude that the legislative history of § 525(a) merely indicates that a governmental unit may act based upon a financial requirement imposed upon a debtor in two narrow instances: (1) where the financial requirement is not based upon the debtor's solvency before discharge, the debtor's bankruptcy, or the debtor's failure to pay a dischargeable debt; or (2) even though the financial requirement is based upon the debtor's solvency before discharge, the debtor's bankruptcy, or the debtor's failure to pay a dischargeable debt, but only if the requirement is not the substantial motivating factor in the decision to act.[6]

5. The Board argues that because it is a government agency pursuing a public welfare policy (i.e., protection of veteran consumers), it is exempt from the automatic stay under § 362. See § 362(b)(4); H.R.REP. NO. 595, 95th Cong., 1st Sess. 342–43 (1977). It infers from this exemption that agencies created for public welfare goals and who obtain no pecuniary advantage from their action against the debtor are not affected by the "fresh start" policy of the Code. This argument ignores, however, that § 525(a) is directed at governmental units and may apply even where the automatic stay has no effect. Furthermore, although the Board's purpose may indeed be as important as the Code's "fresh

start" goals, the court should look at the actual harm which will occur rather than theoretical injury in deciding which policy deserves enforcement.

6. We recognize that our interpretation of the legislative history of § 525(a) may conflict with the Second Circuit's reading of the history in *Goldrich v. N.Y. State Higher Educ. Servs. Corp. (In re Goldrich),* 771 F.2d 28 (2d Cir.1985). There the court interpreted the legislative history as rejecting "a flat prohibition on any form of discrimination," *Goldrich,* 771 F.2d at 31, and found no conflict between the statute and the legislative history creating an exception to the

Applying these standards to the facts of this case, we conclude that the Board has discriminated against the Debtor within the meaning of § 525(a). We recognize that this is not the *Perez* situation, where a state statute expressly discriminates against debtors in bankruptcy. *See Perez v. Campbell,* 402 U.S. 637 at 650, 91 S.Ct. 1704 at 1711.[7] Congress intended § 525(a), however, to expand on and develop *Perez* so that the doctrine would extend to many forms of discrimination. H.R.REP. NO. 595, *supra,* at 366. We also recognize that the Board requires all schools, inside or outside of Chapter 11, to be "financially sound," as prescribed by 38 U.S.C. § 1776, and that it does so to protect the veteran student who takes courses at an unaccredited school. Moreover, the Debtor, by its own admission, was insolvent in the equity sense at the time it filed its petition, i.e., it was unable to pay its debts as they matured. But this does not permit the Board to take the action it did. If the Board had investigated the Debtor's finances and acted after a final court disposition on the Debtor's plan based on post confirmation insolvency (and not on § 525(a) factors), there would be no proscribed discrimination. If the Debtor had failed to live up to several other requirements imposed by § 1776(c) in addition to the financial condition, and the Board was not substantially motivated by the Debtor's insolvency before discharge, the action here would also not fall under § 525(a).

The situation here, however, is that the Board acted on a presumption of present insolvency. Although the Board claims that it acted primarily because the Debtor would not cooperate by furnishing adequate financial data, its letter to the Debtor dated October 20, 1986 states: "Approval is withdrawn because the school is not financially stable." In a previous letter, dated August 20, 1986, the Board informed the Debtor that it was suspending its approval pending an investigation. It also stated that "[f]iling for bankruptcy under chapter 11 has placed the school's financial stability in doubt," and that approval would be withdrawn if the Board did not receive proof of the School's financial stability within 60 days. Although the Debtor responded within six days, the Board believed that the Debtor's assurances of available equity in real estate and of continued operation of the school were not adequate financial data. The Board subsequently acted on the presumptions that the newspaper reports about the Debtor's financial condition were true and that the Debtor would not have filed for bankruptcy if it were financially stable.

From this evidence, we find that the Board withdrew its approval solely because of the Debtor's insolvency, which it presumed. We also find that the Board initiated its investigation and presumed the Debtor insolvent solely because the Debtor filed a petition under Chapter 11. It does not matter that the Debtor was actually

---

statute. *Id.* The court also interpreted the history only to permit discrimination in the layman's sense—i.e., allow the imposition of financial conditions and requirements on debtors so long as everybody else regulated is subject to the same conditions and requirements. *Id.* We respectfully decline to adopt the Second Circuit's reasoning. First, the Second Circuit decided the issue before them—whether a refusal to guarantee a student loan fell within § 525(a) —on the ground that a guarantee of a loan was not a "similar grant" under § 525(a). The guaranty of a loan may well have distinguishing aspects. The court termed its subsequent discussion of the legislative history as unnecessary to its decision and as a "comment" on the history. *See Goldrich,* 771 F.2d at 30. Second, the court ignored the terms in the statute and

placed too much emphasis on the apparent effect of the legislative history. Congress *did* intend a flat prohibition on governmental action based solely on a debtor's bankruptcy or insolvency before discharge. Such an intention is evident on the face of the statute, and we so apply it here.

7. The *Perez* court expressly declined to interpret a statutory requirement that motor vehicle judgment defendants furnish proof of future financial responsibility as a prerequisite to receiving a license renewal. The validity of this portion of the statute was not before the court. *See Perez v. Campbell,* 402 U.S. 637, 642–43, 91 S.Ct. 1704, 1707–08, 29 L.Ed.2d 233 (1971).

insolvent. It is enough that the Board acted based solely on the insolvency.

This case is similar to cases where a state has revoked a debtor's worker's compensation self-insurance because it presumed, on the basis of a bankruptcy filing, that the debtor was financially unsound or insolvent. *In re Rath Packing Co.*, 35 B.R. 615, 617–20 (Bankr.N.D.Iowa 1983); *Hillcrest Foods, Inc. v. Briggs (In re Hillcrest Foods, Inc.)*, 10 B.R. 579 (Bankr.D.Me.1981). In those cases, as in this one, the state received no pecuniary benefit from its withdrawal of approval, but sought to protect the employees of the debtor by ensuring that funds would be available to pay compensation benefits to injured workers. *See Hillcrest Foods*, 10 B.R. at 579. Both courts held that the state's action was prohibited by § 525(a), with one court noting that the action would "frustrate the rehabilitative policy of the Bankruptcy Code" because the debtor would be forced to pay prohibitive costs in order to obtain replacement insurance. *Rath Packing Co.*, 35 B.R. at 620.

The Board's action here would similarly frustrate the Debtor's rehabilitation. Withdrawal of approval will probably lead to the loss of some veteran students, and the students who remain might be unable to pay their tuition in full. We also find that the threat to veteran consumers in this case is minimal. The School intends to continue operation throughout the Debtor's reorganization and afterward. The Debtor has proposed a plan, and expects to pay 100% to creditors depending on the outcome of litigation with a former church member. Even if it loses the litigation, the Debtor expects to continue operation and re-emerge from Chapter 11. One of the reasons that the Debtor filed the petition was so that it could absorb any loss in the litigation ånd continue to be a viable church and school. The possibility of the School closing its doors at this point is remote.

■ The Board is not protected from the reach of Section 525(a) by reason of having acted pursuant to the terms of another federal statute, 38 U.S.C. § 1776(c)(9). Section 525(a) expressly applies to action by, and necessarily on behalf of, any agency of the federal government. *See* 11 U.S.C. § 101(24). The fact that the action is authorized by 38 U.S.C. § 1776 cannot control here. If possible, the two statutes must be construed as consistent with each other so that the purpose of each may be preserved. *Heiden v. Cremin*, 66 F.2d 943, 946 (8th Cir.1933), *cert. denied* 290 U.S. 687, 54 S.Ct. 123, 78 L.Ed. 592 (1933); *see Andrus v. Glover Construction Co.*, 446 U.S. 608, 618–19, 100 S.Ct. 1905, 1911, 64 L.Ed.2d 548 (1980). We have tried to do so by construing § 525(a) to allow the Board to act in certain circumstances. To the extent that the statutes are irreconcilable, however, 11 U.S.C. § 525(a) must prevail over 38 U.S.C. § 1776(c)(9) as the more recent expression of legislative intent. *See United States v. Bordon Co.*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 188–89, 84 L.Ed. 181 (1939) (more recent statute which cannot be reconciled with older statute repeals by implication the older statute only *"pro tanto* to the extent of the repugnancy").[8]

The Board contends that its withdrawal of approval is sanctioned by decisions such as *Holder v. State of Wisconsin Department of Transportation (In re Holder)*, 40 B.R. 847 (Bankr.E.D.Wis.1984). There the state refused to reinstate a discharged debtor's driver's license because the debtor had not proven his continuing financial responsibility. A Wisconsin statute required revocation of a driver's license upon the entry of judgment against him for negligent operation of a motor vehicle. The law further provided that the revocation remained in effect, even though the judgment was paid or discharged in bankruptcy, unless either three years have elapsed or the driver furnishes and maintains, during the three year period, proof of financial responsibility. The court upheld the state's

---

**8.** 38 U.S.C. § 1776(c)(9) was enacted by Congress in 1966. § 525(a) of the Bankruptcy Code was enacted in 1978.

refusal to reinstate the debtor's license, reasoning that the state's action applied to bankruptcy debtors and other defendants alike, and that, unlike what the state sought to do in the *Perez* case, the Wisconsin action was based upon a requirement of continuing financial responsibility rather than payment of a debt discharged in bankruptcy.

*Holder* is quite distinguishable for the present case. The statute there concerned *post-bankruptcy* financial responsibility of a debtor who had already received his discharge in bankruptcy, without regard to payment of his motor vehicle related debt which had been discharged in bankruptcy. Section 525(a) of the Bankruptcy Code does not apply to such action. It is concerned with action taken by reason of failure to pay a dischargeable debt or by reason of insolvency before the bankruptcy filing or after the filing but before the discharge. Although the court in *Holder* apparently did not rely on these distinctions, its decision is consistent with § 525(a).

The *Holder* court did rely upon *Duffey v. Dollison*, 734 F.2d 265 (6th Cir.1984), which dealt with a similar Ohio license revocation statute. In *Duffey*, however, license revocation became effective under the statute by reason of the debtor having failed to satisfy the judgment within 30 days, a period that occurred *before* the debtor's bankruptcy. The *Duffey* court did not discuss whether this was tantamount to taking action by reason of the debtor's pre-bankruptcy insolvency or failure to pay a discharged debt. It was impressed with the fact that the statutory requirement to furnish financial responsibility became fixed prior to bankruptcy. *Duffey* is therefore distinguishable on this point from the case at bar. We nevertheless believe that *Duffey* lacks a reasoned analysis as to whether or not the state action there is tantamount to license revocation "solely" by reason of a combination of pre-bankruptcy insolvency and the failure to pay a debt discharged in bankruptcy. Nonpayment prior to bankruptcy may well have been caused by the debtor's insolvency. If so, the action would seem to be taken "solely" by reason

of that insolvency. Nonpayment after bankruptcy would likely prejudice the debtor's ability to prove financial responsibility, an aspect apparently not present in *Holder* if one were to take the wording of the Wisconsin statute at face value.

None of these more troublesome considerations are present here. As we have stated, the Debtor was insolvent in an equity sense. Its most pressing problem, other than its insolvency, was a disputed $6.5 million claim against it by a former contributor for the return of her donations. This court has previously ruled, in the context of a motion to dismiss the Debtor's petition, that the Debtor's financial problems are sufficiently serious to warrant it seeking to reorganize under Chapter 11. *In re The Bible Speaks*, 65 B.R. 415 (Bankr.D. Mass.1986). Congress has a sound rationale behind the prohibition in § 525(a) of prejudicial governmental action by reason of a debtor's insolvency before discharge. It is unjust that one branch of a city, state or federal government increase the debtor's problems because of its insolvency while the federal judiciary is in the process of applying laws designed to cure that insolvency. As we have stated, the action here is a burden on the Debtor in its "fresh start."

In view of our conclusions concerning Section 525(a), we decline the Debtor's request to search for talismanic qualities in 11 U.S.C. § 105(a) by sifting through the entrails of § 365(e). Section 105(a) permits this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3rd Cir.1985); *Johnson v. First Nat'l Bank of Montevideo, Minn.*, 719 F.2d 270 (8th Cir.1983); *In re Otero Mills, Inc.*, 25 B.R. 1018 (D.C.N.Mex.1982). Section 525(a) is enough to invoke Section 105(a) in this situation.

It is accordingly ORDERED that John C. Bigelow, Agent for Veteran Affairs, and the Board of Regents of Higher Education of the Commonwealth of Massachusetts,

having failed to show cause, are hereby enjoined from continuing the withdrawal of approval of The Stevens School of The Bible under the provisions of 38 U.S.C. § 1776.