**In the Matter of IT CORPORATION. (Two Cases)** ■

[Cite as *In re IT Corp.* (1989), 61 Ohio App.3d 470.]

Court of Appeals of Ohio,
Franklin County.

Nos. 88AP–293, 88AP–320.

Decided Feb. 9, 1989.

472

*James D. Donohoe;  Squire, Sanders & Dempsey, J. Van Carson* and *Karen A. Winters;*  and *Michael C. Salmon,* for appellee.

*Robert D. Horowitz,* prosecuting attorney, *Gary D. Cerrone* and *D.T. Station,* for appellants Board of Commissioners of Stark County and Board of Trustees of Canton Township.

*W. Scott Gwin,* Law Director, and *Robert G. Rubin,* for appellant city of Canton.

*Anthony J. Celebrezze, Jr.,* Attorney General, *Paul D. Hancock* and *Julianna F. Bull,* for appellee Ohio Hazardous Waste Facility Board.

---

Peggy L. Bryant, Judge.

Appellants, Board of Commissioners of Stark County, the Board of Trustees of Canton Township, and the city of Canton, appeal an order of the Ohio Hazardous Waste Facility Board ("board"), granting a hazardous waste facility permit to IT Corporation and LTV Steel Company, Inc., for construction of a hazardous waste disposal facility in Canton Township, Stark County, Ohio.

Pursuant to R.C. 3734.05(A), IT Corporation, f.k.a. D'Appolonia Waste Systems, submitted an application for a permit to the Ohio Environmental Protection Agency on December 16, 1982, seeking to locate a facility for disposal of electric arc furnace ("EAF") dust on a fifty-five-acre site owned by LTV Steel in Canton Township. On August 1, 1985, the Ohio Environmental Protection Agency ("EPA") transmitted the application to the board. An adjudication panel conducted hearings from November 1985 to March 1986, and submitted a report and recommendation on February 2, 1987. On January 27, 1988, the board issued its opinion and final order granting the requested permit.

Appellants appealed to this court, setting forth six assignments of error:

"1. The Ohio Hazardous Waste Facility Board erred in granting the subject permit by basing its decision exclusively on the design features of the proposed facility to the effective exclusion of site suitability considerations.

"2. The Hazardous Waste Facility Board erred in not requiring the consideration of bona fide alternate sites as required by O.R.C. Section 3734.-05(C)(6)(c) and in view of the fact that the board did not determine the design features of the facility to be exemplary or in excess of the minimum requirements set forth in O.R.C. Section 3734.05.

"3. The Hazardous Waste Facility Board erred in issuing a permit to an applicant who has filed for protection under Chapter 11 of the United States Bankruptcy Code during the pendency of such proceeding and prior to the confirmation of a plan of reorganization and such action is contrary to the

requirement of Ohio Revised Code Section 3734.05(C)(6)(f) that the applicant demonstrate sufficient reliability.

"4. The board erred in determining that the proposed facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of various alternatives and other pertinent considerations and such a determination is contrary to the requirements of O.R.C. Section 3734.05(C)(6)(c).

"5. The finding and determination of the board that the proposed facility represented the minimum risk of contamination of ground and surface water as required by O.R.C. Section 3734.056(C)(6)(d)(i) is erroneous and not supported by substantial reliable and probative evidence.

"6. The Hazardous Waste Facility Board erred in granting a permit to LTV Steel Company Inc. and IT Corporation as joint permittees and without first requiring specific documentation providing for the allocation of responsibilities of each co-applicant."

Appellants' first and fifth assignments of error are interrelated and will be discussed jointly. In their first assignment of error, appellants set forth two arguments, the first of which is that the board's order and opinion contain no factual finding that the site in question is suitable. Appellants' second and more substantial argument is that the board erred by failing to consider the suitability of the site independently of its consideration of the design of the proposed facility.

The applicable statute, R.C. 3734.05, does not specifically mention site suitability. The relevant portion of R.C. 3734.05(C)(6) merely provides that:

"The board shall not approve an application for a hazardous waste facility installation and operation permit unless it finds and determines as follows:
" * * *

"(c) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of various alternatives, and other pertinent considerations;

"(d) That the facility represents the minimum risk of all of the following:

"(i) Contamination of ground and surface waters;

"(ii) Fires or explosions from treatment, storage, or disposal methods;

"(iii) Accident during transportation of hazardous waste to [footnote omitted] the facility;

"(iv) Impact on the public health and safety;

"(v) Air pollution;

"(vi) Soil contamination."

■ Consistent with R.C. 3734.05, the board defined a suitable site for a hazardous waste facility as one in which "there are no fatal geological flaws present and the geology of the site and the engineering design of the facility act in harmony to minimize risks." Under this definition, the board can determine the geological suitability of the proposed site only if it considers geological factors in conjunction with the efficacy of the technology that the proposed facility will employ. Applying that definition to the facts herein, the board found the site at issue to be "suitable." Accordingly, neither of the above-mentioned arguments advanced in appellants' first assignment of error is well-taken.

■ Further, in both their first and fifth assignments of error, appellants argue that the evidence does not support a finding that the site is suitable, in that building the facility in its proposed location will create an unacceptable risk of ground and surface water contamination. Initially, we note that our review of issues relating to sufficiency of evidence is limited to determining whether the board's order is supported by reliable, probative, and substantial evidence. R.C. 3734.05(C)(7).

Using this standard, we find that sufficient evidence supports the board's determination, made pursuant to R.C. 3734.05(C)(6)(d)(i), that the proposed facility represents the minimum risk of ground and surface contamination. Initially, substantial expert testimony existed to support the board's conclusion that percolation of EAF dust itself into the soil is not physically possible. Secondly, an expert testified that the waste also will probably not absorb enough rainwater to create dissolved, contaminated leachates, due in part to the waste's very low permeability.

Further, even if one assumes that leachate is created, the evidence supported a finding that the impermeable clay and synthetic liners underlying the waste "cells" will prevent the leachate from escaping into the ground. As a further precaution, the board conditioned the permit upon the applicant's supplying the Ohio EPA with a copy of the manufacturer's warranty for the synthetic liners. The board also conditioned the permit upon the liner system passing, to the satisfaction of the Ohio EPA, a United States Environmental Protection Agency's test for compatibility of waste and membrane liners before the liner system is installed. Moreover, the design of the facility includes leachate collection and detection systems.

Any risk of contact with groundwater is also minimized by a subsurface drain, which will, according to testimony, lower the water table to a point below the liners. Thus, escaped leachate will not immediately reach the water

table; in fact, the evidence indicated that the leachate would instead tend to follow the pathway of the artificial drainage system.

Even if all the preceding systems were to fail and leachate were to escape into the groundwater, ample evidence existed to support a determination that the leachate would still pose little risk. More particularly, expert testimony at the hearing revealed that three potentially interconnected aquifers lie beneath the surface at the proposed site (an aquifer being a layer of rock or soil that is permeable to water). Groundwater in the topmost aquifer, the "sand and gravel" aquifer, flows from south to north towards the east branch of Nimishillen Creek. Groundwater also flows northward in the next highest aquifer, the "soil bedrock interface." Groundwater in the lowest aquifer, the bedrock formations themselves, flows southward.

Most of the sixty-seven residential water wells located within two thousand feet of the site lie to the south of the proposed site, meaning that the leachate would have to reach the southward flowing bedrock aquifer before the wells would be endangered. Expert testimony indicated that, based on the fact that the leachate will have to first pass through aquifers flowing vertically and northward, the leachate reaching the bedrock aquifer would be an "improbable" or "remote" event; that the nearest downgradient well (downgradient meaning downhill in relation to the water table) was two thousand three hundred feet from the facility; and that, assuming the most pessimistic figures, contaminated leachate would take twenty-three years to reach that well. Indeed, the city of Canton's own consulting hydrogeologist admitted in a report that the proposed facility would not "pose any risk of danger to Canton's wellfields and its water supply" and that "there is absolutely no way that leachate from the landfill can reach any of Canton's present or potential wellfields." The possibility of contamination is further lessened by a system of monitoring wells, created to detect escaped leachate before it reaches the residential wells.

Finally, substantial evidence in the record indicates that even if contaminated leachate enters the drinking supply, no adverse health impact will result. The leachate could potentially contain four groundwater contaminants: (1) hexavalent (i.e., toxic) chromium; (2) cadmium; (3) lead; or (4) selenium. However, the board, relying on expert testimony, found that, of the four contaminants, only chromium would be present in any actual leachate, due to the fact that the other materials are extremely immobile in organic clay soils of the type found at the site. Substantial evidence also existed to support the board's finding that the hexavalent chromium will not create health problems, since the highest expected concentration will be well below both the United States EPA's primary drinking water standard and the "no

observed adverse effect level" for hexavalent chromium. In sum, reliable, probative, and substantial evidence supports the board's finding that the facility represents a minimum risk to ground and surface water contamination.

■ Appellants also contend in their first assignment of error that the board should not have granted the permit because of the risk of accidents during the transportation of hazardous waste to the facility. However, substantial evidence supported the board's conclusion that the risk due to accident is "negligible and insignificant," given the board's determinations that most of the waste will have to travel only from LTV's steel plant located directly across Trump Road from the site and that, since the wastes are not acutely toxic, an accidental spill will not create any immediate health hazards.

■ Finally, in their first assignment of error, appellants contend that the board wrongly issued the permit, given the language in a report submitted by appellees indicating that the proposed site is only "marginally suited" to be a landfill. However, when read in context, the report based its "marginally suited" rating upon a "worst case model," which assumed that the facility incorporated only minimal design and operation measures to prevent environmental damage. For example, the report assumed that no liners, covers, leachate collection systems, fencing, and waste-compacting would be incorporated into the facility's design. Ultimately, the report concluded that the site was suitable, provided that "certain measures to mitigate possible adverse environmental impact are incorporated into the design."

Based on the foregoing, we overrule appellants' first and fifth assignments of error.

■ To address appellants' remaining assignments of error out of order, appellants contend in their fourth assignment of error that the board erred when it determined, pursuant to R.C. 3734.05(C)(6)(c), that the proposed facility represents the minimum adverse environmental impact.

Appellants first argue that the facility's technology lacks a "time tested track record," which is needed to evaluate the technology's effectiveness. However, "where an applicant demonstrates that the technology it proposes is the most advanced, most environmentally protective technology available, no further examination of other technologies is necessary." *West Virginia v. Hazardous Waste Facility Approval Bd.* (1986), 28 Ohio St.3d 83, 84, 28 OBR 179, 181, 502 N.E.2d 625, 628. In the present case, the board specifically found that the proposed technology, when considered in conjunction with the conditions attached to the permit, is the most advanced, environmentally protective technology available. The board relied upon expert testimony to

the effect that the facility will employ the "most advanced" and "best" land disposal technology and that it is a "model" facility. Therefore, pursuant to *West Virginia, supra,* the board did not need to consider alternative technologies.

■ Appellants also argue that the board ignored evidence of geological instability in reaching its decision. Specifically, an expert stated at the hearing that he believed a "slump block"[1] consisting of shale exists under the glacially deposited soil upon which the facility rests; and that, if the slump block moves further, the probability of contaminated leachate entering the water supply may increase.

However, the witness also testified that only the part of the facility lying directly above the slump block is a matter for concern, and that most of the waste cells will not lie above the slump block. In addition, the witness said that movement by the slump block is "a very unlikely possibility." Furthermore, other witnesses presented evidence that minimized the danger of subsidence. Specifically, one witness testified that, in his opinion, no slump block exists at the site and that, even if one exists, only extreme forces could make it slide further. Another witness testified that, in view of the alleged slump block's angle of repose and given principles of mechanics, any additional weight loaded on top of the block (*e.g.,* the weight of the proposed facility) will actually increase the forces holding the block in place.

Given the foregoing, we find the board's conclusion well supported by substantial, reliable and probative evidence. We therefore overrule appellants' fourth assignment of error.

In their second assignment of error, appellants assert that, regardless of whether the proposed site is suitable, the board erred by failing to consider whether other sites are more suitable. Essentially, appellants make two arguments. The first argument is that the board erred by failing to make a bona fide inquiry into the suitability of alternative sites. The second, narrower argument is that the board can refuse to consider alternative sites, but only if it first finds that the proposed facility is "exemplary," which appellants allege the board did not do in the present case.

■ To address the latter argument first, while the board did not use the word "exemplary," it did conclude, as we noted previously, that the proposed technology is "the most advanced, environmentally protective technology available." Because a finding that the technology is the "most advanced" is

---

1. According to the record, a slump block is a formation of rock or soil that has slid en masse down an inclined surface.

the equivalent of a finding that the technology is "exemplary," appellants' argument fails.

■ Similarly, appellants' other, broader argument fails because:

" * * * R.C. 3734.05 contains no requirement that the board consider alternative sites in every case, as appellants propose. The board must consider alternative sites only if it deems such evidence to be a 'pertinent consideration' under R.C. 3734.05(C)(6)(c), but it is under no statutory obligation to do so. In the cause *sub judice,* the board did consider the appropriateness of the proposed location, and decided not to require additional siting information. This court will not substitute its judgment for that of the board, especially in areas of administrative expertise. *Dudukovich v. Housing Authority* (1979), 58 Ohio St.2d 202, 207 [12 O.O.3d 198, 201, 389 N.E.2d 1113, 1116]." *West Virginia, supra,* 28 Ohio St.3d at 85, 28 OBR at 181, 502 N.E.2d at 628–629.

In the present case, the board found it unnecessary to consider alternative sites because of its finding that the proposed facility will reduce potential adverse environmental effects to a minimum and because the site is close to a one-hundred-thousand-ton pile of EAF dust that will be deposited in the proposed facility. We, therefore, find that the board complied with R.C. 3734.05(C)(6)(c). Accordingly, we overrule appellants' second assignment of error.

■ Appellants' argument in support of their third assignment of error, as stated in their reply brief, is that the board failed even to consider the fact that LTV Steel has filed in federal court for reorganization under Chapter 11 of the United States Bankruptcy Code. Appellants' argument is without merit for two reasons: the board, realizing that LTV might not own the facility after the bankruptcy proceedings are complete, conditioned the permit on LTV supplying the Ohio EPA with a copy of the proposed plan for reorganization that LTV will submit to the bankruptcy court. Secondly, the board "expressed concern" that LTV would be unable to obtain liability insurance for the facility because of the bankruptcy proceedings. Clearly, then, the board considered the effect of LTV's bankruptcy when determining whether to issue a permit.

■ To the extent that appellants argue that LTV's bankruptcy rendered the issuance of the permit improper, we disagree. First, we are mindful that discrimination against bankrupts by a governmental unit can violate the Supremacy Clause of the United States Constitution. See *Perez v. Campbell* (1971), 402 U.S. 637, 649–652, 91 S.Ct. 1704, 1711–1712, 29 L.Ed.2d 233, 242–244. Further, Section 525(a), Title 11, U.S.Code, specifically prohibits a

governmental unit from denying a person a permit or license solely because of the person's status as a bankrupt or debtor under federal law. As a result, were the board to require every applicant to prove its solvency before the board could regard the applicant as financially responsible, the board arguably might be acting contrary to Section 525(a). See *In re The Bible Speaks* (Bankr.Ct.Mass.1987), 69 B.R. 368, 373, fn. 6; but, see, *In re Goldrich* (C.A. 2, 1985), 771 F.2d 28, 31. Secondly, appellants' concern that bankruptcy will hamper LTV's ability to meet its financial obligations in relation to the facility is misplaced. LTV presented evidence that, despite its bankruptcy petition, it had obtained liability insurance complying with Ohio Adm.Code 3745–55–47 and a surety bond addressing the cost of closure and post-closure care of the facility. In addition, the permit is conditioned upon the permittee submitting yearly updates complying with the financial assurance provisions contained in Ohio Adm.Code 3745–55–43, 3745–55–45, and 3745–55–47. Thus, the record contains substantial evidence that LTV has provided necessary financial assurances.

Moreover, while appellants' assertion that LTV might not own the proposed facility when it emerges from bankruptcy proceedings is correct, R.C. 3734.-05(H) sets up a process by which the owner of permit may transfer it to another person; and under subsection (4)(b) thereof, the Director of the Ohio EPA may approve the revision of a permit after public notice and comment. If the change in ownership is deemed a "modification," meaning a change "that impacts on the siting criteria contained in division (C)(6) of this section," the board must approve or disapprove the transfer in accordance with the factors in R.C. 3734.05(C)(6). See R.C. 3734.05(H)(1) and (4)(a). In light of these procedures, we find that the possibility that ownership of the facility may change did not preclude the board from issuing the permit.

Based on the foregoing, we overrule appellants' third assignment of error.

Finally, in their sixth assignment of error, appellants argue that the board erred by issuing a joint permit to the appellees. We must first address the appellees' contention that appellants waived their argument by not filing a timely objection to the panel's report. The panel recommended that, before any disposal activities begin at the facility, LTV and IT Corporation submit a contract to the Ohio EPA that details the allocation of responsibilities between the two permittees. In response to appellants' objection, the board required the appellees to submit the contract before *construction* begins on the site. The appellees now claim that appellants never put before the board the specific argument that the appellees should submit the contract, not only before construction begins, but before the permit issues.

The record, however, does not support appellees' contention that appellants waived their objection. We must confine our review to the record as certified to this court by the board, R.C. 3734.05(C)(7), and the voluminous record in the present case does not contain a copy of any of appellants' objections. Lack of documentation could mean either that appellants made no objections or that appellants' objections have been omitted. The latter is true in the present case because the record reveals that appellants made *some* objections, in that the board's opinion refers to a document entitled "Objection of the Stark County Commissioners, Canton Township Trustees, and the City of Canton to the Report and Recommendation." Without the benefit of reading the objections in their entirety, we are reluctant to assume that appellants failed to preserve the joint permit issue for review. We, therefore, address the issue on its merits.

Appellants first argue that R.C. 3734.05 does not authorize the board to issue a permit to several persons jointly. We disagree. R.C. 3734.05(B) does refer only to "a person" and "the applicant." However, even when a statute uses only the singular form of a noun, one should generally construe the statute to refer also to the plural form. R.C. 1.43(A). Because of the absence of evidence in the present case that this rule of construction is inconsistent with the terms of R.C. 3734.05, "person," as used in the statute, refers to "persons." See *Wingate v. Hordge* (1979), 60 Ohio St.2d 55, 58, 14 O.O.3d 212, 214, 396 N.E.2d 770, 772 (construction of the word "person" in a statute).

Appellants also argue that the board should not have issued the permit before the appellees determined their contractual duties. More particularly, appellants contend that the board cannot issue a permit subject to conditions that are crucial to deciding whether to issue a permit at all. However, we find that conditioning the permit upon the Ohio EPA's approval of the contract was proper.

R.C. 3734.05 sets forth the role for the board in the context of hazardous waste management. A permit application is first submitted to the Ohio EPA, which must determine that the application complies with the performance standards in R.C. 3734.12 and the agency rules promulgated under that section. The application is not transmitted to the board until the EPA has approved the application. R.C. 3734.05(B)(3). If the board determines that the application complies with the standards in R.C. 3734.05(C)(6), the statute provides that the board may issue a permit "upon such terms and conditions as the board finds are necessary to ensure the construction and operation of the hazardous waste facility in accordance with the standards of this section." R.C. 3734.05(C)(6). Enforcement of the condition then becomes the responsi-

bility of the EPA. See R.C. 3734.05(D)(4); *West Virginia, supra,* 28 Ohio St.3d at 87–88, 28 OBR at 183, 502 N.E.2d at 630–631. R.C. 3734.05 does not explicitly place any restrictions on the matters that permit conditions may address, other than to state that the board may not approve an application unless the application meets the standards in R.C. 3734.05(C)(6). Since we have already determined that sufficient evidence supported the board's finding that those standards have been met in the present case, the board acted within its authority when it issued the permit, even though some pertinent matters "could not yet be proven." *West Virginia v. Hazardous Waste Facility Approval Bd.* (Dec. 3, 1985), Franklin App. No. 84AP–896, unreported, 1985 WL 4158, affirmed (1986), 28 Ohio St.3d 83, 28 OBR 179, 502 N.E.2d 625. Consequently, we overrule appellants' sixth assignment of error.

Having overruled all of appellants' assignments of error, we affirm the board's order.

*Order affirmed.*

STRAUSBAUGH and MCCORMAC, JJ., concur.