24 F.3d 984
 44 Soc.Sec.Rep.Ser. 469, Medicare & Medicaid Guide
P 42,269
LITTLE COMPANY OF MARY HOSPITAL AND HEALTH CARE CENTERS, an
Illinois Not-For-Profit corporation, Plaintiff-Appellant,
v.
Donna SHALALA, as Secretary of the U.S. Department of Health
and Human Services, Gail R. Wilensky, as Administrator of
the Health Care Financing Administration, Blue Cross and
Blue Shield of Illinois, et al., Defendants-Appellees,
and
LITTLE COMPANY OF MARY HOSPITAL AND HEALTH CARE CENTERS, an
Illinois Not-For-Profit Corporation, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
and William Toby, Jr., as Acting Administrator of
the Healthcare Financing Administration,
Defendants-Appellees.
 Nos. 93-2032, 93-2922.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 14, 1994.
Decided May 19, 1994.
 
 Joshua G. Vincent, William G. Swindal, D. Kendall Griffith, Kristin E. Hutson, Kurt L. Hudson (argued), Hinshaw & Culbertson, Chicago, IL, for Little Co. of Mary Hosp. and Health Care Centers.
 Alan S. Dorn (argued), Dept. of Health and Human Services, Region V, Office of Gen. Counsel, James J. Kubik, Asst. U.S. Atty., Civ. Div., Appellate Section, Chicago, IL, for Donna E. Shalala and William Toby, Jr.
 Before POSNER, Chief Judge, CUDAHY, Circuit Judge, and McDADE, District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Hospitals that provide inpatient treatment for Medicare patients are paid a predetermined amount per patient discharged, based primarily on the patient's diagnosis.[1] Under the Prospective Payment System (PPS), instituted in 1983, in order to receive payment, the hospital--when a patient is discharged--assigns the discharge a Diagnostic Related Group (DRG) number. This is essentially a code number that correlates with the national average cost of providing the necessary services for that diagnosis, adjusted for regional variations. The DRG is a function of the patient's diagnosis, age, sex and medical history. The hospital sends the DRG assignment to an insurance company (or "intermediary," which is acting on behalf of the Department of Health and Human Services (HHS)), and the insurance company pays the hospital.
 
 
 2
 The patient's diagnosis is factored into this equation by matching the diagnosis with a corresponding number from the International Classification of Diseases, 9th edition-Clinical Model coding system (ICD-9), a medically-recognized ranking of diagnoses. The ICD-9 code and the other relevant factors are combined, through a formula, to generate the DRG. It appears that the higher the ICD-9 code, the more costly it is to treat the diagnosis, since higher ICD-9 codes yield higher DRGs, and therefore larger payments to the hospital.
 
 
 3
 Little Company of Mary Hospital and Health Care Centers (Little Company) allegedly received the assistance of its intermediary, Blue Cross/Blue Shield of Illinois, in designing its computer system. The design was arranged in such a way that the hospital staff would input the relevant factors (including the ICD-9 code), and the computer would automatically assign the patient a DRG.
 
 
 4
 But when the Prospective Payment System was first instituted in 1983, with just three exceptions, all ICD-9 codes greater than 86.99 were treated alike.[2] Little Company's computer system was therefore apparently programmed in such a way that when an ICD-9 code greater than 86.99 was entered, the system would only look to see whether the code entered was one of the three exceptions. If not, the DRG assignment routine treated the code as if it were 86.99. "Hard-coding" logic in a code-based computer program, especially one based on rapidly-changing government regulations, which is what happened here, is considered one of the cardinal sins in the design of computer software, and this case demonstrates why.
 
 
 5
 Little Company's system worked perfectly well as long as the ICD-9 codes greater than 86.99 were in fact irrelevant to the DRG computation. But on October 1, 1987, the Secretary established a new DRG--DRG 475 (Respiratory System Diagnosis with Ventilator Support). DRG 475 applied to ICD-9 codes between 93.92 and 96.04. But Little Company did not respond to the creation of DRG 475 by modifying its software to take advantage of the change. Therefore, for diagnoses that corresponded with these newly-recognized ICD-9 codes (and there were 88 of these diagnoses submitted between October 1987 and September 1989, when Little Company discovered its mistake), Little Company's system generated "deflated" DRGs. The hospital therefore underbilled the insurance company--and was as a result underpaid--more than $300,000 over this two-year stretch.
 
 
 6
 It took Little Company almost two years to discover its mistake. Little Company then asked Blue Cross, its intermediary, to revise these DRGs, but Blue Cross refused, citing the HHS regulation that gives hospitals only 60 days to correct erroneous DRG assignments. See 42 C.F.R. Sec. 412.60(d). Little Company sought to appeal its year-end reimbursement calculations for both 1988 and 1989 to the Provider Review Reimbursement Board (PRRB), but the PRRB refused to take jurisdiction over the appeals. Each of these decisions was appealed to the district court: the period ending June 30, 1988 to Judge Williams, and the period ending June 30, 1989 to Judge Plunkett. Both affirmed the PRRB's declination of jurisdiction, though their reasoning differed slightly. The appeals from these decisions have been consolidated, and are now before us. We affirm, for reasons we explain below.
 
 
 7
 * By enacting the Prospective Payment System in 1983, Congress dramatically altered the mechanism by which hospitals are paid for treating Medicare patients. The former system paid hospitals, after the fact, for the actual "reasonable" expenses they incurred. This system, it was argued, "was like giving hospitals a blank check to cover the cost of care for the elderly," because increased hospital costs were simply forwarded to Medicare. Judith R. Lave, The Impact of the Medicare Prospective Payment System And Recommendations For Change, 7 Yale J. Reg. 499, 501 (1990).
 
 
 8
 Congress, too, observed that this regime discouraged hospitals from finding more cost-effective methods of treatment, and thus replaced this system with the Prospective Payment System, enacting the Social Security Amendments of 1983, Pub.L. No. 98-21, 97 Stat. 65. Under PPS, diagnoses are classified into one of 475 DRGs. The DRG--not the actual cost of treating the patient--determines the hospital's payment. One might hypothesize that the effect of such a change would be to encourage hospitals to reduce the cost--and perhaps the quality--of care provided (since additional days of care generate increased costs but, very likely, no revenue). In practice, however, it has proven "difficult to isolate the specific effects of PPS." Lave, 7 Yale J.Reg. at 508. See also Note, Rethinking Medical Malpractice Law in Light of Medicare Cost Cutting, 98 Harv.L.Rev. 1004, 1008 (1985) (arguing that under PPS "the need to abide by cost-cutting protocols is likely to cause physicians to act in a manner that sometimes falls below the professional standards by which they are judged by both their peers and the courts").
 
 
 9
 * Under Medicare's basic framework, set out at 42 U.S.C. Sec. 1395 et seq., HHS enters into a contract with an insurance company, and that insurance company pays hospitals, on behalf of HHS, for treating Medicare patients. The insurance company's decision whether and how much to pay the hospital are reviewable by the HHS Provider Reimbursement Review Board (PRRB or Board), whose determinations, in turn, are subject to judicial review. This essential structure of review pre-dates the institution of the Prospective Payment System, though Congress amended the review procedures when it enacted PPS.
 
 
 10
 Under the system of payment in effect before PPS, hospitals (or "providers") would at the end of the fiscal year submit a cost report to the intermediary. The intermediary would audit the report to determine which costs would be reimbursed, and report its conclusion as to the total amount due to the provider in a Notice of Program Reimbursement (NPR). The intermediary would make estimated interim payments throughout the year, but no final determination was made until the NPR was issued. In that document the estimated interim payments would be retroactively adjusted to bring the amount paid into line with the "reasonable" costs the hospital actually incurred. When the NPR was issued, a provider could seek review before the PRRB.
 
 
 11
 The PRRB's jurisdiction is created by 42 U.S.C. Sec. 1395oo. Before the advent of PPS, that section read, in pertinent part:
 
 
 12
 Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Rimbursement Review Board ... if--
 
 
 13
 (1) such provider--
 
 
 14
 (A) is dissatisfied with a final determination of the organization serving as its fiscal intermediary ... as to the amount of total program reimbursement due the provider ...
 
 
 15
 42 U.S.C. Sec. 1395oo (1982).
 
 
 16
 Thus, because the PRRB only had jurisdiction to hear a challenge to a "final determination of the ... intermediary" as to the "amount of total program reimbursement," only the issuance of the year-end NPR--and not the interim payments themselves--would trigger the Board's jurisdiction.
 
 B
 
 17
 In enacting PPS, Congress made a number of changes in the appeals process. The amended statute laying out the Board's jurisdiction reads as follows (with new language in italics):
 
 
 18
 Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board ... and ... any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within the time as the Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by the Board, if--
 
 
 19
 (1) such provider--
 
 
 20
 (A)(i) is dissatisfied with a final determination of the organization serving as its fiscal intermediary ... as to the amount of total program reimbursement due the provider ..., or(ii) is dissatisfied with a final determination of the Secretary as to the amount of payment under subsection (b) or (d) of section 1395ww of this title.
 
 
 21
 42 U.S.C. Sec. 1395oo (1988).
 
 
 22
 This new language set out a second appeals route. In addition to being able to appeal the "final determination of the ... intermediary," following the issuance of a year-end NPR, a provider could appeal to the Board if it was "dissatisfied with a final determination of the Secretary as to the amount of payment under subsection (b) or (d) of section 1395ww of this title." Subsections (b) and (d) of Sec. 1395ww are the provisions that set out the calculation of the various PPS payments themselves.
 
 
 23
 While this language--one would have thought--made clear that both year-end NPRs and periodic PPS payments could be appealed to the PRRB,[3] the Secretary at first took the surprising position that the Board could not hear appeals from PPS payments until after an NPR has been issued. But the D.C. Circuit, despite the Secretary's argument that its reading of the statute was entitled to deference, rejected this interpretation, finding the language of the statute to be unambiguous. Washington Hospital Center v. Bowen, 795 F.2d 139 (D.C.Cir.1986). According to the court, requiring a hospital to wait for an NPR before appealing a PPS payment would render the new language--setting up a new appeals mechanism in PPS cases--"mere surplusage." Id. at 146. The D.C. Circuit therefore found that the statute "clearly contemplates two different kinds of appeal. One begins when the intermediary issues an NPR; the other, when the intermediary issues a notice of what will be paid under the PPS system." Id. at 145.
 
 C
 
 24
 The Board here dismissed Little Company's appeal on the grounds that it lacked jurisdiction. The theory that the Secretary offers to support this conclusion is that the statute requires a hospital, when appealing a PPS payment to the Board, to submit "such reports within the time as the Secretary may require in order to make payment under such section."[4] According to the Secretary, the "report" that she requires is the data that hospitals need to submit on discharging a patient (age, sex, diagnoses, procedures performed). In addition, if these "reports" contain errors, the resubmission of proper discharge data such that the intermediary can make payment under the correct DRG also constitutes the submission of a "report."
 
 
 25
 The statute clearly gives the Secretary the authority to impose time limits on the submission of these reports by a provider, and the Secretary further contends that the 60-day rule represents such a time limit.[5] The 60-day rule to which the Secretary refers is published at 42 CFR Sec. 412.60(d), and provides that a "hospital has 60 days after the date of the notice of the initial assignment of a DRG[6] to a discharge to request a review of that assignment. The hospital may submit additional information as part of its request." Because the hospital here did not resubmit the proper discharge information within 60 days of its receipt of the remittal advice, this prerequisite (compliance with 60-day rule) was not satisfied, and the Secretary thus argues that the Board was correct to decline jurisdiction.
 
 
 26
 Little Company attacks this argument on two fronts. First, it insists that the 60-day rule impermissibly interferes with its statutory right to appeal, and second, it argues that the 60-day rule is in any event inapplicable to it, since it is appealing the year-end NPR, not the PPS payments. We address these arguments in turn.
 
 II
 
 27
 First we turn to the attack on the 60-day rule as violating the statute. 42 C.F.R. Sec. 412.60(d) says that a "hospital has 60 days after the date of the notice of the initial assignment of a discharge to a DRG to request a review of that assignment." The Secretary here argues that this regulation is an exercise of her authority under Sec. 1395ii (incorporating 42 U.S.C. Sec. 405(a) into the Medicare Act), to establish "necessary and appropriate" procedures to carry out her administrative responsibilities.
 
 
 28
 The statute plainly delegates to the Secretary the authority to require "reports," and to set deadlines for the submission of those reports. Little Company responds by making a rarified linguistic argument. In its view, the Secretary is only permitted, under the statute, to require reports that are necessary "in order to make payment." Because, it says, the 60-day rule affects only the time limit for an appeal, not for "payment," it is not authorized by the statute.
 
 
 29
 We see no merit to this argument, since it seems obvious to us that to require a hospital to provide the intermediary with all of the information necessary properly to reimburse the hospital is to require information "in order to make payment." It is true that the amended Sec. 1395oo is a complicated statute. See Washington Hospital Center, 795 F.2d at 147 (commenting on the statute's "linguistic complicat[ions]" and "semantic twists and turns"). In particular, the "statute's language regarding the timing of PPS appeals is remarkably vague." Hall, 38 U.Fla.L.Rev. at 432. But the difficulty here is simply ascertaining what Congress meant by "report ... require[d] in order to make payment," and in light of the statute's ambiguity, the Secretary's proffered construction--that the bills and revisions of those bills that a hospital submits to its intermediary in order to receive correct payment represent such "reports"--strikes us as the more sensible one.
 
 III
 
 30
 But in addition to challenging the validity of the 60-day rule, Little Company also insists that, even if the rule is otherwise a valid one, it is inapplicable to it. Its reasoning is that the 60-day rule (and its accompanying limitation on the Board's jurisdiction) applies only to appeals from PPS payments. But Little Company claims to be appealing not from a determination of a PPS payment, but rather from the year-end NPR.
 
 
 31
 * The Secretary's first response to this claim suggests that because the relevant statutory language requiring "reports"--"any hospital ... which has submitted such reports within the time as the Secretary may require in order to make payment"--is in the introductory portion of Sec. 1395oo (a), it applies both to appeals from NPRs (from part (1)(A)(i)) as well as from PPS payments (from part (1)(A)(ii)). Since the 60-day rule comes out of this introductory statutory language, the Secretary argues that the 60-day rule applies to appeals from NPRs as well as from PPS payments. Otherwise put, the Secretary's argument is that the "reports" provision in the 1983 amendments--which obviously applies to PPS appeals--should also apply to the pre-existing NPR appeals.
 
 
 32
 On this point we find the Secretary's reading to be unduly strained. The structure of the statute makes clear that Congress contemplated two distinct routes of appeal: one from year-end NPRs and one from PPS payments. And the common sense and structure of the amendment aside, the statutory language itself unambiguously indicates that the Secretary's authority to require reports and impose time limits (the "reports" provision) extends only to appeals of PPS payments. According to that provision, "any hospital [receiving PPS payments and that files timely reports as the Secretary requires] may obtain a hearing with respect to such payment by the Board, if [the provider is dissatisfied with a final determination of the amount of its PPS payment.]" 42 U.S.C. Sec. 1395oo (a) (emphasis supplied). The language "with respect to such payment" makes clear that the Secretary's authority to require the timely filing of reports as a jurisdictional prerequisite applies only to PPS payments, not to appeals from year-end NPRs. The provisions of the statute therefore cannot, as the Secretary here suggests, be mixed and matched.
 
 B
 
 33
 But the Secretary has a second argument. Because the statute sets out a complicated procedural framework for appealing PPS payments, the Secretary contends that it would be incongruous to simply allow a hospital to conduct an end-run around all of these procedures by waiting until the year-end cost report is issued. At that time, under this implausible reading, the hospital could use the challenge to the year-end report as a vehicle for first objecting to a DRG assignment that could have been properly challenged when the PPS payment was originally made. To allow this, Little Company admited in oral argument, would be effectively to annul the 60-day rule.
 
 
 34
 This analysis requires us to examine the relationship between the periodic PPS payments and the year-end NPR. Originally it was apparently thought that the institution of PPS would eliminate the need for year-end cost reports and NPRs, save for the few instances where PPS would not apply. "When PPS is fully implemented, cost reports will no longer be necessary." Hall, 38 U.Fla.L.Rev. at 431. See also Washington Hospital Center, 795 F.2d at 146 n. 8; H.R.Rep. No. 47, 98th Cong., 1st Sess. 182, reprinted in 1983 U.S.Code Cong. & Ad.News 404, 472 (indicating that while PPS would not otherwise require hospitals to file cost reports, the Secretary could nonetheless continue to require such reports so as not to disrupt the flow of information to states that relied on the reports for their own reimbursement programs).
 
 
 35
 Since under the pre-PPS regime the right to appeal was triggered by the filing of a cost report and the issuance of the NPR, if the cost reports were going to be eliminated under PPS, then--if PPS payments were to be appealable at all--it would have required amendment of the statute. The point of the amendments, on this theory, was to allow the Board to review the PPS payments--not just permit an earlier opportunity to appeal a payment that could in any event later be appealed when the NPR was issued at the end of the year.
 
 
 36
 But, in fact, the cost report and the NPR have not been eliminated. Rather, 42 C.F.R. Sec. 412.52 requires all hospitals participating in PPS to satisfy the cost reporting requirements of 42 C.F.R Secs. 413.20 and 413.24, which require the filing of a cost report. Thus, PPS hospitals receive periodic interim payments that reflect estimates of their DRG payments due to date, and at the end of the year the hospitals submit cost reports, have their accounts reconciled, and receive retroactive adjustments when the NPR is issued.
 
 
 37
 This leads Little Company to contend that it should have two opportunities to appeal: first under the system for appealing PPS payments as set out under the statute and second under the system for appealing year-end NPRs. And in the matter before us, Little Company contends, it is appealing the year-end NPR. It admits that its objections to the NPR stem from erroneous DRG assignments, and that those assignments could have been challenged earlier under the provisions that allow an appeal from PPS payments, but it does not believe its failure to appeal earlier should deprive it of its ability to appeal now.
 
 
 38
 In response to this claim, the Secretary contends that even if the Board had "jurisdiction" over Little Company's appeal from the NPR, there is no merit to that appeal. The Board is bound by the 60-day rule, and would not have the "authority" to allow Little Company to circumvent its application by couching its appeal from the PPS payments as an appeal from the NPR.
 
 
 39
 On this view, the Board's review on appeal from an NPR is limited to those acts of the intermediary that are first reflected in the NPR. For example, if the intermediary committed an error in reconciling the periodic payments, such an error would be cognizable by the Board on reviewing the NPR.
 
 
 40
 But here Little Company was not attacking the reconciliation of the individual charges and payments--which it admits is the purpose of the NPR--but rather was challenging the individual payments themselves. In other areas of the law doctrines like waiver, e.g. Old Republic Ins. Co. v. Federal Crop Ins. Corp., 947 F.2d 269, 276 (7th Cir.1991); res judicata, see Restatement (Second) of Judgments Sec. 24 (1982); and abuse of the writ, see McCleskey v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), prevent a party from belatedly raising an issue that it had ample opportunity to raise earlier. The Secretary insists that the same should be true here, that even if the Board has jurisdiction, Little Company's failure to appeal the PPS payment within the 60-day limit established by 42 C.F.R. Sec. 412.60(d) should be treated as a failure to exhaust available remedies, barring the Board from granting relief.
 
 
 41
 This would represent a different rationale than that invoked by the Board, which denied "jurisdiction," and courts are typically not permitted to affirm agency action on grounds other than those advanced by the agency whose actions are under review. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The Secretary, seeing this difficulty with her case, points us to Osmani v. INS, 14 F.3d 13, 15 (1994), where we recognized an exception to Chenery where "it is clear what the agency's decision has to be."
 
 
 42
 But we do not think we need here to rely on Osmani, because it seems to us that a "failure to exhaust" should preclude Little Company from even claiming that it is "dissatisfied" with the intermediary's final determination of total program reimbursement, and "dissatisfaction" is a jurisdictional requirement. That, in any event, appears to be the teaching of the Supreme Court in Bethesda Hospital v. Bowen, 485 U.S. 399, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988), to which the Secretary draws our attention.
 
 
 43
 In Bethesda Hospital, a hospital was attempting to challenge a Medicare rule that malpractice insurance costs were not reimbursable. The hospital in question did not submit its malpractice insurance costs to its intermediary, because it knew that under existing regulations those costs could not be reimbursed, and that the intermediary was required to follow existing regulations. But when the hospital sought to challenge those regulations before the PRRB, the Board declined jurisdiction on the theory that it had jurisdiction only to hear an appeal where the provider is "dissatisfied with a final determination ... of its intermediary," 42 U.S.C. Sec. 1395oo (a). Because the hospital failed to submit these costs to the intermediary, it cannot be said to be "dissatisfied" with the intermediary's determination.
 
 
 44
 The Supreme Court rejected the Board's position, finding that the PRRB had jurisdiction. "Providers know that, under the statutory scheme, the fiscal intermediary is confined to the mere application of the Secretary's regulations, that the intermediary is without power to award reimbursement except as the regulations provide, and that any attempt to persuade the intermediary to do otherwise would be futile." Bethesda Hospital, 485 U.S. at 404, 108 S.Ct. at 1259.
 
 
 45
 That holding by itself does not decide our case. It says only that a provider can challenge a rule before the Board even after "admitting" that the rule is applicable when submitting its expenses to its intermediary.[7] But the Court's next sentence suggests a resolution here. "Thus, petitioners stand on a different ground than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules." Id. at 404-405, 108 S.Ct. at 1259. This language strongly suggests that a hospital that does not ask its intermediary to reimburse it for all of the costs for which it is entitled to be reimbursed cannot, on appeal to the Board, first ask for new costs. While we need not decide whether this would be true if the provider were appealing its original PPS payment, surely this failure, coupled with its failure to appeal the earlier payment, estops Little Company from now claiming to be "dissatisfied."[8]
 
 
 46
 While the Court in Bethesda Hospital noted that "such defaults might well establish that a provider was satisfied with the amounts requested in its cost report and awarded by the fiscal intermediary," id. at 405, 108 S.Ct. at 1259, it noted that "those circumstances are not presented here." Id. But here we have just those circumstances, since Little Company is precisely the "provider[ ] who ... fail[s] to request from the intermediary reimbursement for all costs to which [it is] entitled under applicable rules" to which the Bethesda Hospital Court was referring. Such a provider, the Court strongly hints, should not be permitted to later claim to be "dissatisfied" with the reimbursement it receives and thereby invoke the Board's jurisdiction. Picking up on that hint, at least in the context where the provider also fails to appeal the PPS payment, we hold accordingly.
 
 IV
 
 47
 Little Company closes its brief with a flurry of miscellaneous objections, which we may quickly dispose of. There is no merit to the argument that the establishment of an "exhaustion" requirement contravenes Congress' express language and intent. It rather seems to us that such a requirement is implicit in the creation of two different avenues of appeal. Further, the Supreme Court's language in Bethesda Hospital, 485 U.S. at 405, 108 S.Ct. at 1259 strongly suggests that the Secretary may adopt such a requirement.
 
 
 48
 Nor does Darby v. Cisneros, --- U.S. ----, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), suggest otherwise, since that case addressed whether courts could require exhaustion of administrative remedies before allowing parties to seek judicial review. Darby was thus an interpretation of Sec. 10(c) of the Administrative Procedure Act (which provides for judicial review). That analysis is inapposite to the question here--whether an agency can require--under the organic statute it is charged with administering--the exhaustion of particular administrative remedies as a condition to the availability of others. That question is answered by Chevron U.S.A. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which tells us to defer to reasonable agency interpretations of ambiguous statutes.[9]
 
 
 49
 Little Company additionally contends that the Secretary's interpretation denies it the right to "suitable retroactive corrective adjustments," to which it claims to be entitled under Sec. 1395x(v)(1)(A)(ii). But this argument assumes that the periodic payments Little Company received left it "underreimbursed." See Good Samaritan Hospital v. Shalala, --- U.S. ----, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). In rejecting its previous arguments, we have concluded that it was not.
 
 
 50
 Next, Little Company suggests that Sec. 412.60(d) is "defective" under the statute because the remittal advice (which triggers the 60-day rule) does not provide sufficiently express notice of the intermediary's "final determination." See 42 U.S.C. Sec. 1395oo(a)(3). But, as the Secretary has argued, the 60-day rule limits only the amount of time a provider has to submit a revised bill to the intermediary. The remittal advice therefore became a "final determination" only by virtue of Little Company's failure to submit a timely revision. Had it submitted a revision on time and had the intermediary denied its correction, that refusal would have been a "final determination" subject to Board review. But because the "finality" of the remittal advice turned on Little Company's disregard of the 60-day rule, it cannot now object to having received insufficient notice of its "finality."
 
 
 51
 Little Company next insists that these regulations are arbitrary and capricious and a denial of due process. But in this regard the regulations operate like any other statute of limitations. It is true, as Little Company points out, that the regulations operate to prevent meritorious claims from being heard. But that is a feature of every statute of limitations, and has never before been thought to pose a constitutional problem.
 
 
 52
 Finally, Little Company contends that the 60-day rule is being enforced against it retroactively, which it says is impermissible under Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). But Sec. 412.60(d) was published on September 1, 1987, and went into effect on October 1, 1987. All of the discharges in question here took place after October 1, 1987. Thus, despite the fact that Little Company's cost period began on July 1, 1987, the rule cannot in any way be said to have operated retroactively to Little Company's detriment. The judgments of the district court are therefore AFFIRMED.
 
 
 
 *
 Hon. Joe Billy McDade of the Central District of Illinois, sitting by designation
 
 
 [1]
 Medicare is the federal health insurance program, enacted in 1965 in Title XVIII of the Social Security Act, 42 U.S.C. Sec. 1395 et seq., which provides health insurance primarily to Social Security recipients over 65 years old, and to those who are deemed permanently disabled under the Social Security Act. See generally 1 Harvey L. McCormick, Medicare and Medicaid Claims and Procedures (2d ed. 1986) viii
 
 
 [2]
 The three exceptions were ICD-9 codes 87.53, 92.27 and 95.04
 
 
 [3]
 It is unclear whether the reference to payment under Sec. 1395ww(b) & (d) allows appeal of each PPS payment (as long as the $10,000 jurisdictional amount requirement of Sec. 1395oo (a)(2) is satisfied), or whether appeals should be allowed only at the beginning of each year when hospitals are informed of their new PPS rates. While it has been argued that it "would be absurd for each bill to constitute a Review Board appeal-triggering event," Mark A. Hall, Rate Appeals Under Medicare's New Payment System: Reflections on the Meaning of 'Prospectivity', 38 U.Fla.L.Rev. 407, 433 (1986), the Secretary in the case before us appears to suggest that each bill constitutes a "report," such that a hospital can appeal to the Board if "dissatisfied with a final determination of the Secretary as to the amount of payment."
 
 
 [4]
 While the Secretary here argues that this language, in the introductory part of Sec. 1935oo (a), applies to appeals from both year-end NPRs and PPS payments, Br. at 29-30, it is clear enough that "such payment" refers only to PPS payments--"payments in amounts computed under subsection (b) or (d) of section 1395ww of this title."
 
 
 [5]
 The conclusion that each individual PPS payment is separately appealable--see note 3--appears to be the consequence of this argument. In order for the 60-day rule to be "jurisdictional," it needs to be read in connection with that part of the statute that permits the Secretary to require reports and impose time limits. But the 60-day rule is a time limit only on the submission of bills. If those bills, as the Secretary insists, are "reports," then it would appear that each bill gives rise to a right to appeal to the PRRB
 
 
 [6]
 While in practice it appears to be the hospital, and not the intermediary or HHS that assigns a DRG to a discharge, it is here agreed that the 60-day period begins to run when--after a hospital has sent a DRG assignment to its intermediary--the hospital receives its "remittal advice" back from the intermediary
 
 
 [7]
 Thus, if Little Company wanted to challenge the validity of the 60-day rule it would have been permitted to comply with the rule, and still claim to be "dissatisfied" and therefore challenge the rule before the Board
 
 
 [8]
 Note that the "dissatisfaction" requirement appears twice in the statute: once referring to appeals from year-end NPRs (Sec. 1395oo (a)(1)(A)(i)), and once referring to appeals from PPS payments (Sec. 1395oo (a)(1)(A)(ii)). Because the present argument addresses Little Company's appeal from its year-end NPR, the statute's first dissatisfaction requirement is at issue
 
 
 [9]
 Nor is there anything to the argument, based on Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), that the Secretary has impermissibly foreclosed judicial review of the DRG assignments. The 60-day rule and the exhaustion requirement limit only the Board's review. As long as the rules in question are correct legal interpretations--and we have found that they are--Little Company cannot complain that they limit judicial review of the assignments