**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. NV-23-1179-LCP |
| TERRY L WIKE, | |
| Debtor. | Bk. No. 21-11982-mkn |
| TERRY L WIKE, | |
| Appellant, | |
| v. | **OPINION** |
| STATE BAR OF NEVADA, | |
| Appellee. | |

Appeal from the United States Bankruptcy Court
for the District of Nevada
Mike K. Nakagawa, Bankruptcy Judge, Presiding

APPEARANCES

Appellant Terry L. Wike argued pro se; Daniel M. Hooge argued for appellee.

Before: LAFFERTY, CORBIT, and PEARSON[*], Bankruptcy Judges.

LAFFERTY, Bankruptcy Judge:

---

[*] Hon. Teresa H. Pearson, United States Bankruptcy Judge for the District of Oregon, sitting by designation.

1

## INTRODUCTION

Terry L. Wike ("Debtor") appeals the bankruptcy court's order denying his request for relief under § 525(a),[1] which protects debtors from discrimination based on, among other things, the failure to pay a discharged debt. Debtor asserts the State Bar of Nevada (the "State Bar") improperly conditioned his reinstatement to the practice of law on payment of a discharged debt. The State Bar disagrees, arguing that the debt was excepted from discharge under § 523(a)(7).

Thus, for the second time in just a few months,[2] we are required to confront the difficult questions that arise when a State Bar's obligation to police and regulate attorneys overlaps, and potentially conflicts with, the protections afforded to debtors who file for bankruptcy and receive a discharge.

This appeal presents three issues. First, given that the Supreme Court of Nevada (the "SCN") ruled on Debtor's § 525(a) claim before the bankruptcy court was asked to rule thereon, we must assess whether the SCN's determination presents a bar to federal review of Debtor's claim. We hold that it does not.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] *See Albert-Sheridan v. State Bar of Cal. (In re Albert-Sheridan)*, 658 B.R. 516 (9th Cir. BAP 2024).

Second, although the SCN did not discuss the dischargeability of the subject debt, the bankruptcy court held that the debt was excepted from discharge under § 523(a)(7). We disagree. We believe a close reading of the Nevada rule that gave rise to the subject debt, and the SCN's comments about that rule, compel a different conclusion.

Lastly, we must address whether a governmental entity's regulatory motive for requiring payment of a discharged debt is a proper basis for denying a debtor relief under § 525(a). We hold that, under binding Supreme Court authority, a governmental entity's regulatory motive is not a relevant consideration for purposes of § 525(a) and, as a result, cannot serve as a basis for denial of a claim under the statute.

We therefore REVERSE the bankruptcy court's ruling and REMAND with instructions to the bankruptcy court to assess Debtor's § 525(a) claim under the standards set forth herein.

We publish to address two issues of first impression: (i) whether the *Rooker-Feldman* doctrine applies to inaccurate interpretations of § 525 by a state court; and (ii) whether disciplinary costs imposed under Nevada's State Court Rule 120 are excepted from discharge under § 523(a)(7).

## FACTS[3]

### A.    Prepetition Events

In 2020, the State Bar held two disciplinary hearings against Debtor, investigating allegations that he had mishandled client funds. The State Bar found that Debtor violated his professional duty under Nevada law to safekeep client property and recommended certain disciplinary measures against Debtor.

After reviewing the State Bar's recommendations, the SCN issued two orders suspending Debtor from the practice of law. In both orders, the SCN weighed four factors in determining the appropriate disciplinary measure to impose on Debtor: the duty violated, the lawyer's mental state, the injury caused by the lawyer's misconduct, and any aggravating or mitigating factors. After considering these factors, the SCN tailored disciplinary sanctions aimed at correcting Debtor's conduct. In response to the first violation, the SCN ordered suspension, required that Debtor be mentored by an attorney knowledgeable in accounting practices, and required Debtor to submit quarterly accounting reports. In response to the second violation, the SCN ordered a longer suspension.

In both orders suspending Debtor from the practice of law, the SCN also assessed disciplinary costs against Debtor. The SCN ordered two types

---

[3] In his reply brief, Debtor disputes certain facts set forth by the State Bar. Appellant's Reply Br., pp. 5-8. The Panel did not rely on any disputed facts in reaching this decision.

of disciplinary costs: (i) the costs of the disciplinary proceeding, meaning the actual costs incurred by the State Bar; and (ii) $2,500 "mandated" by Nevada Supreme Court Rule ("SCR") 120(3).

**B.  Debtor's Bankruptcy Filing and the Parties' Dispute**

On April 19, 2021, Debtor filed a chapter 7 petition. After the chapter 7 trustee submitted a report of no distribution, Debtor received his chapter 7 discharge.

Subsequently, the SCN issued an order reinstating Debtor to the practice of law, subject to certain conditions (the "Conditional Reinstatement Order"). In the Conditional Reinstatement Order, the SCN decided to reinstate Debtor despite Debtor's failure to pay the disciplinary costs imposed through the prior suspension orders. The SCN noted that "the record supports the. . .finding that [Debtor] had financial difficulties since his suspension and was unable to pay the cost assessments during his suspension." Based thereon, the SCN allowed Debtor to resume practicing law on a probationary basis, conditioning a full reinstatement on Debtor: (i) having a mentor knowledgeable about personal injury law and its accounting practices; (ii) submitting quarterly accounting statements to his mentor and the State Bar; and (iii) paying all previously incurred disciplinary costs, as well as the costs incurred by the State Bar in connection with the reinstatement proceeding and another $2,500 mandated by SCR 120(3).

The SCN did not require Debtor to pay the disciplinary costs immediately; rather, the SCN required payment by the end of Debtor's probationary period of two years.[4] In the interim, regardless of unpaid disciplinary costs, the State Bar allowed Debtor to practice law subject to having a mentor and submitting the required reports.

In connection with his reinstatement proceeding, Debtor asserted that any disciplinary costs he owed to the State Bar had been discharged. In the Conditional Reinstatement Order, the SCN did not take a position on the dischargeability of the disciplinary costs; rather, the SCN held that Debtor's reinstatement may be conditioned on the payment of disciplinary costs "regardless of whether [the disciplinary costs were] discharged in bankruptcy." The SCN instead focused its analysis on whether the conditions of reinstatement were discriminatory for purposes of § 525(a):

> The primary purposes of attorney discipline are to promote an attorney's rehabilitation, deter misconduct, and protect the public. *E.g., State Bar of Nevada v. Claiborne*, 104 Nev. 115, 756 P.2d 464 (1988); *In re Findley*, 593 F.3d 1048, 1052-54 (9th Cir. 2010); *In re Feingold*, 730 P.3d 1268, 1275 (11th Cir. 2013); *Brookman v. State Bar of California*, 760 P.2d 1023, 1026 (Cal. 1988). As such, the recommended condition of reinstatement does not run afoul of 11 USC § 525 because its purpose is not to penalize [Debtor] for having obtained a discharge of his debt. The California Supreme Court reasoned similarly when it rejected an attorney's argument that 11 USC § 525 prohibited requiring him to repay the client security fund for restitution

---

[4] The Conditional Reinstatement Order was entered on February 24, 2022, so it would seem Debtor's probationary period ended on February 24, 2024.

6

the fund paid to the attorney's client after the attorney obtained a discharge of the restitution order. *Brookman*, 760 P.2d at 1025. In so doing, the court observed that "the purpose of attorney discipline is not to penalize petitioner merely for having obtained a discharge of his debt in bankruptcy. Instead, it is to protect the public from specified professional misconduct. . .and at the same time to rehabilitate the errant attorney." *Id.* at 1025-26; see also *Hippard v. State Bar*, 782 P.2d 1140, 1145 (Cal. 1989) (extending *Brookman*'s reasoning to petitions for reinstatement).

In response to the Conditional Reinstatement Order, Debtor moved to reopen his bankruptcy case and filed a motion for sanctions against the State Bar, asserting that the State Bar violated § 525(a) by conditioning his reinstatement on a debt that was discharged. The bankruptcy court disagreed. In an order denying Debtor's motion, the bankruptcy court held that, pursuant to the Circuit's[5] decision in *Kassas v. State Bar of California*, the disciplinary costs were excepted from Debtor's discharge under § 523(a)(7). 49 F.4th 1158 (9th Cir. 2022).

The bankruptcy court also held that, even if the disciplinary costs were discharged, the State Bar's actions did not violate § 525(a) because such actions were not taken "solely" because Debtor had filed bankruptcy. Instead, relying on the Conditional Reinstatement Order, the bankruptcy court found that the purpose of requiring payment of disciplinary costs was "to promote an attorney's rehabilitation, deter misconduct, and protect

---

[5] Any references to the "Circuit" in this Opinion are to the Ninth Circuit Court of Appeals.

7

the public." The bankruptcy court also noted that the disciplinary costs had been assessed prepetition and, as a result, Debtor's bankruptcy filing was not a factor in their assessment.

Finally, the bankruptcy court noted that the *Rooker-Feldman* doctrine prevented the bankruptcy court from reevaluating the Conditional Reinstatement Order. Debtor timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court err in holding that the *Rooker-Feldman* doctrine prohibits reconsideration by the bankruptcy court of a state court's inaccurate interpretation of § 525(a)?

2. Did the bankruptcy court err in holding that the disciplinary costs imposed by the SCN were excepted from discharge pursuant to § 523(a)(7)?

3. Did the bankruptcy court err in holding that the State Bar did not violate § 525(a) by conditioning Debtor's reinstatement to the practice of law on the payment of disciplinary costs incurred under Nevada law?

## STANDARDS OF REVIEW

We review de novo the bankruptcy court's decision regarding dischargeability of a debt. *See Scheer v. State Bar (In re Scheer)*, 819 F.3d 1206,

1209 (9th Cir. 2016). We review de novo a bankruptcy court's conclusions of law, including statutory interpretations. *Parks v. Drummond (In re Parks)*, 475 B.R. 703, 706 (9th Cir. BAP 2012) (citation omitted).

## DISCUSSION

Congress, recognizing the immense impact governmental organizations that perform licensing functions can have on a debtor's livelihood, enacted § 525(a) to protect the fresh start promised to debtors who receive a discharge. H.R. REP. No. 95-595, 366-67 (1977). Section 525(a) provides, as relevant to this matter, that "a governmental unit may not deny, revoke, suspend, or refuse to renew a license" or condition the grant of a license to a debtor "solely because such" debtor "has not paid a debt that is dischargeable in the case under this title. . . ."

Here, Debtor's § 525(a) claim presents a two-step analysis: first, we must assess whether the disciplinary costs are dischargeable, or if the costs were excepted from Debtor's discharge under § 523(a)(7). If the disciplinary costs were excepted from discharge, as the bankruptcy court held, our review ends there. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307 (2003) ("The government *may* take action that is otherwise forbidden when the debt in question is one of the disfavored class that is nondischargeable.") (emphasis in original). However, if the disciplinary costs were discharged, we proceed to the next step: assessing whether the

State Bar refused to fully reinstate Debtor "solely" because Debtor has not paid the outstanding disciplinary costs.[6]

We believe the bankruptcy court erred in holding that the disciplinary costs were excepted from discharge, as we discuss in Section B. We also believe the bankruptcy court erred in its analysis of § 525(a), as we discuss in Section C.

However, before we discuss these issues, we must first address whether the *Rooker-Feldman* doctrine presents an obstacle to this appeal. The bankruptcy court believed it was bound by the SCN's holding that the State Bar did not violate § 525(a). At first glance, this would appear to be the case – after all, the Conditional Reinstatement Order is an order by the highest court of Nevada, and Debtor brought his § 525(a) claim to the bankruptcy court after the SCN ruled against him on the same claim.

But the question is not so simple. In this Circuit, it is established that state court orders that disregard or modify the discharge injunction are void, and *Rooker-Feldman* does not prevent federal review of such state court orders. *See McGhan v. Rutz (In re McGhan)*, 288 F.3d 1172 (9th Cir. 2002); *Gruntz v. Cty. of L.A. (In re Gruntz)*, 202 F.3d 1074 (9th Cir. 2000) (en banc). Pursuant to these authorities, bankruptcy courts are not prohibited from examining state court orders that purport to resolve the reach of the discharge injunction. *Id.*

---

[6] Debtor does not dispute that the State Bar is a governmental unit. *See* SCR 76(1) (referring to the State Bar as a "public corporation").

10

The question of whether the reasoning in *Gruntz* and *McGhan* extends to state court orders that incorrectly interpret § 525(a) is a matter of first impression in this Circuit. We believe it does. As we discuss in Section A, our opinion is informed not only by *Gruntz* and *McGhan*, but also by reference to Congress's intent in enacting § 525(a) as a crucial tool for enforcement of the discharge injunction.

## A. The bankruptcy court erred in holding that the *Rooker-Feldman* doctrine forecloses consideration of this matter.

The *Rooker–Feldman* doctrine prohibits "review and rejection" by federal courts of "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced . . . ." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Relying on this doctrine, the bankruptcy court stated that the Conditional Reinstatement Order is not "susceptible to collateral attack in the bankruptcy court or in any other federal court," adding that "whatever may be the [SCN's] interpretation of its [SCR] 120 or any other interpretation of the purpose of the requirement to pay the disciplinary costs, is not subject to review by this court."[7]

---

[7] As discussed in detail in Section B.2. below, the SCN did not actually interpret SCR 120. Rather, the SCN generally stated that attorney discipline is meant to "promote an attorney's rehabilitation, deter misconduct, and protect the public" as part of its analysis of § 525(a), **not** SCR 120. While this portion of the SCN's ruling may be relevant to our analysis under § 523(a)(7), as discussed below, it has no bearing on our *Rooker-Feldman* analysis. For purposes of *Rooker-Feldman*, we are assessing whether the bankruptcy court was barred from considering Debtor's claim under § 525(a) because of the SCN's prior ruling holding that § 525(a) did not apply to the State Bar's actions.

Two Circuit decisions guide our opinion and indicate why the *Rooker-Feldman* doctrine does not apply to incorrect state court interpretations of § 525(a). *Gruntz*, 202 F.3d 1074; *McGhan*, 288 F.3d 1172. In *Gruntz*, after the debtor's case was converted from a chapter 13 to a chapter 11, the chapter 13 trustee stopped disbursing payments on a confirmed plan, including child support payments owed to the debtor's ex-spouse. *Gruntz*, 202 F.3d at 1077. As a result, the ex-spouse sought relief through the Los Angeles District Attorney, and a jury eventually convicted the debtor for violating a section of the state penal code regarding failure to support dependent children. *Id.*

The debtor later filed a complaint in bankruptcy court, asserting that the state criminal proceedings were void because they violated the automatic stay. *Id.* The bankruptcy court dismissed the complaint, holding it was collaterally estopped by the state conviction. On appeal, the district court affirmed the dismissal based on the *Rooker-Feldman* doctrine. *Id.* at 1077-78.

The Circuit disagreed. *Id.* at 1084. The Circuit first noted that *Rooker-Feldman* "is not a constitutional doctrine" but derives from two federal statutes regarding federal district court jurisdiction. *Id.* at 1078 (citing 28 U.S.C. §§ 1257, 1331). "To derive a coherent theory of federal jurisdiction," however, the Circuit had to assess not only these statutes but "the entire federal jurisdictional constellation." *Id.* at 1079. Of course, this constellation

12

included the federal statutory scheme governing bankruptcy cases. *Id.* In reviewing the Code, the Circuit observed:

> In apparent contradiction to the *Rooker–Feldman* theory, bankruptcy courts are empowered to avoid state judgments, *see, e.g.,* 11 U.S.C. §§ 544, 547, 548, 549; to modify them, *see, e.g.,* 11 U.S.C. §§ 1129, 1325; and to discharge them, *see, e.g.,* 11 U.S.C. §§ 727, 1141, 1328. By statute, a post-petition state judgment is not binding on the bankruptcy court to establish the amount of a debt for bankruptcy purposes. *See* 11 U.S.C. § 109(e) . . . .
>
> Thus, final judgments in state courts are not necessarily preclusive in United States bankruptcy courts. Indeed, the rule has long stood that "[a] state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *Gonzales v. Parks (In re Gonzales),* 830 F.2d 1033, 1036 (9th Cir. 1987).

*Id.* Notable also was "Congress's plenary power over bankruptcy" stemming from the Constitution. *Id.* at 1080 (citing U.S. Const., Art. I, § 8). Through this power, "Congress can limit that jurisdiction which courts, State or Federal, can exercise over the person and property of a debtor who duly invokes the bankruptcy law." *Id.* (quoting *Kalb v. Feuerstein*, 308 U.S. 433, 439 (1940)). "[J]urisdiction and authority over bankruptcies has been vested, from the beginning of the Republic, in the federal district courts." *Id.* (citations omitted). "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Id.* (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).

13

The Circuit acknowledged that "[n]ot all matters related to bankruptcies fall within the orbit of those subject to federal plenary power." *Id.* On this point, the Circuit drew a distinction between "core" and "non-core" matters, holding that "core" matters that went to the heart of "restructuring of debtor-creditor relations" fell squarely within Congress's plenary power. *Id.* at 1080-81. Actions involving the termination, annulment, or modification of the automatic stay clearly qualified as such "core" matters. *Id.* at 1081.

With this background, the Circuit held that the "automatic stay is an injunction issuing from the authority of the bankruptcy court, and bankruptcy court orders are not subject to collateral attack in other courts." *Id.* at 1082. "For these reasons, actions taken in violation of the automatic stay are void." *Id.* (citing *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992)).

In *Gruntz*, the Circuit was cognizant of the fact that states may have concurrent jurisdiction on certain issues implicating the automatic stay. *Id.* at 1082-83. Nevertheless, the Circuit concluded that state court judgments "would have to defer to the plenary power vested in the federal courts over bankruptcy proceedings." *Id.* at 1083. The Circuit also provided valuable policy considerations in support of its holding:

> The rule urged by the County would undermine the principle of a unified federal bankruptcy system, as declared in the Constitution and realized through the Bankruptcy Code. If state courts were empowered to issue binding judgments modifying

the federal injunction created by the automatic stay, creditors would be free to rush into friendly courthouses around the nation to garner favorable relief. The bankruptcy court would then be stripped of its ability to distribute the debtor's assets equitably, or to allow the debtor to reorganize financial affairs. Such an exercise of authority would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating. It is but slight hyperbole to say that chaos would reign in such a system.

*Id.* at 1083–84 (cleaned up).

Subsequently, the Circuit applied the holding of *Gruntz* to the discharge injunction. In *McGhan*, the debtor was convicted in state court for violating a California penal statute prohibiting sexual molestation of a minor. *McGhan*, 288 F.3d at 1175. After his conviction, the debtor filed a chapter 7 petition and listed the victim as a creditor holding an unsecured claim against him based on a potential civil action for personal injury. *Id.* at 1175-76. The victim's mother, as his guardian at the time, received timely notice of the deadline to file a complaint of nondischargeability, but did not do so. *Id.* at 1176. Subsequently, the debtor received a discharge. *Id.*

Upon reaching adulthood, the victim filed a lawsuit against the debtor in state court. *Id.* at 1177. In response to the debtor's motion to dismiss the lawsuit as a violation of the discharge injunction, the victim argued that he had not received adequate notice under § 523(c)(1). *Id.* The state court first held that it had jurisdiction under § 523(a)(3) to determine

the adequacy of notice and the applicability of the discharge injunction to the lawsuit before it. *Id.* The state court then held that the notice to the victim had been inadequate and, as a result, the victim was not bound by the discharge order. *Id.*

The debtor then moved to reopen his bankruptcy case to file a complaint for violation of the discharge injunction. *Id.* The bankruptcy court denied the motion, and this Panel affirmed the bankruptcy court's denial, opining that the *Rooker-Feldman* doctrine precluded the bankruptcy court from modifying the state court's decision. *Id.* at 1177-78.

As in *Gruntz*, the Circuit disagreed. *Id.* at 1182. The Circuit first reiterated the "broader implications" of *Gruntz*:

> First, *Gruntz* holds not only that a federal court may review state court decisions modifying an automatic stay, but also that state courts lack jurisdiction in the first instance to modify the stay.
> . . . .
> Second, *Gruntz* bars state court intrusions on all "bankruptcy court orders" (or other "core" bankruptcy proceedings), not just the automatic stay. . . . Thus, just as a state court does not have the power to modify or dissolve the automatic stay, a state court also lacks authority to modify or dissolve a discharge order or the § 524 discharge injunction.

*Id.* at 1179 (cleaned up) (citing, *inter alia*, *Pavelich v. McCormick, Barstow (In re Pavelich)*, 229 B.R. 777, 782 (9th Cir. BAP 1999) ("Congress has plenary authority over bankruptcy in a manner that entitles it to preclude state courts from doing anything in derogation of the discharge.").

The Circuit believed that extending the holding of *Gruntz* to the discharge injunction "flow[ed] naturally from the policy concerns that informed our decision there." *Id.* at 1180.

> Our decision was animated by our concern that permitting a state court to modify the federal automatic stay would undermine the principle of a unified federal bankruptcy system, as declared in the Constitution and realized through the Bankruptcy Code. If state courts were empowered to issue binding judgments modifying the federal injunction created by the automatic stay, creditors would be free to rush into friendly courthouses around the nation to garner favorable relief. The same concerns arise when California courts purport to modify a discharge order and to grant relief from the bankruptcy court's permanent injunction.

*Id.* (cleaned up). As such, the Circuit held that "the state court lacked authority to adjudicate the adequacy of the notice received by" the victim or hold that the victim was not bound by the discharge order or injunction. *Id.* In doing so, the state court "effectively modified" the discharge injunction. *Id.*

*McGhan* cited positively a prior decision by this Panel. *Pavelich*, 229 B.R. 777. In *Pavelich*, the Panel considered "whether the bankruptcy court can enforce the discharge in the face of a contrary state court judgment," *id.* at 781, reasoning that:

> Regardless of what a state court may do with respect to the personal liability of a discharged debtor, the bankruptcy court has jurisdiction to enforce the statutory discharge injunction.

17

> This necessarily places the bankruptcy court in the position of scrutinizing a state court judgment. The bankruptcy court, of necessity, must be able to ascertain the extent to which the judgment is void under § 524(a)(1) as an essential element of determining whether the § 524(a)(2) discharge injunction has been violated.

*Id.* at 782. The Panel's thorough consideration of bankruptcy court authority and § 524 led the Panel to conclude that, "[i]n short, the state court has jurisdiction to construe the bankruptcy discharge correctly, but not incorrectly. An incorrect construction would be void ab initio." *Id.* at 784; *see also Huse v. Huse-Sporsem, A.S. (In re Birting Fisheries, Inc.)*, 300 B.R. 489, 500 (9th Cir. BAP 2003) ("In the Ninth Circuit. . .bankruptcy courts are not bound by incorrect state court judgments in core matters that fall within a bankruptcy court's 'arising under' jurisdiction.") (citation omitted).[8]

---

[8] In *Pavelich*, the Panel stressed that their holding was narrow, and distinguished between state court interpretations of the discharge injunction and state court determinations regarding whether particular debts are excepted from discharge. *Pavelich*, 229 B.R. at 783. It is not always easy to differentiate between these determinations; after all, if a state court inaccurately holds that a debt is excepted from discharge, would that not qualify as an improper modification of the discharge injunction, which, under federal bankruptcy law, included the debt the state court now deems nondischargeable?

The issue of nondischargeability was not before the Panel in *Pavelich*, so this commentary may be dicta. Moreover, although the Circuit referenced *Pavelich* positively in *McGhan*, the Circuit ultimately held that the state court "modified" the discharge injunction by holding that a debt was excepted from discharge under § 523(a)(3). Thus, it certainly seems as if inaccurate judgments regarding whether particular debts are excepted from discharge also may be scrutinized by bankruptcy courts without running afoul of *Rooker-Feldman*.

We believe the well-reasoned and thorough analyses in *Gruntz*, *McGhan*, and *Pavelich* equally apply to state court orders that incorrectly interpret § 525(a) because such orders undermine the discharge injunction. As with actions to modify the automatic stay or discharge injunction, a claim under § 525(a) is "core." *See Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1131 (9th Cir. 2010) ("A matter 'arises under' the Bankruptcy Code if its existence depends on a substantive provision of bankruptcy law, that is, if it involves a cause of action created or determined by a statutory provision of the Bankruptcy Code.") (citations omitted).

Moreover, Congress intended § 525(a) as a tool to enforce the discharge injunction and prevent reaffirmations of discharged debt:

> This section is additional debtor protection. It codifies the result of *Perez v. Campbell*, 402 U.S. 637 (1971), which held that a state would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.
>
> . . . .
>
> This section permits further development to prohibit actions by governmental or quasi-governmental organizations that

---

In any event, we need not reach this issue because, here, the SCN did not make any determinations regarding the dischargeability of the disciplinary costs. Rather than analyze dischargeability under § 523(a)(7), the SCN instead held that the State Bar did not violate § 525(a) "regardless of whether the cost assessment in the discipline order was discharged in bankruptcy." As such, we need not address *Pavelich*'s commentary regarding state court decisions on exceptions to discharge for purposes of this appeal.

> perform licensing functions, such as a state bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start . . . .
>
> The effect of this section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

H.R. REP. No. 95-595, 366-67 (1977).

Thus, "[t]here is a strong relationship between the prohibition of discriminatory treatment of section 525(a) and the prohibition against attempts to collect discharged debts under section 524, which deals with the effect of a discharge." 4 Collier on Bankruptcy ¶ 525.03 (Richard Levin & Henry J. Sommer, eds., 16th ed.). As aptly stated by a leading treatise:

> Both sections share the goal of eradicating discriminatory or coercive treatment of debtors who have received a discharge in bankruptcy.
>
> In view of the similarity in purpose of sections 524 and 525(a), the sections must be read together to understand the full scope of the protection given.

*Id.* Because Congress's "plenary authority over bankruptcy . . . entitles it to preclude state courts from doing anything in derogation of the discharge," and because § 525(a) is a necessary component to enforcing the discharge injunction, the reasoning in *Gruntz* and *McGhan* necessarily applies to incorrect state court interpretations of § 525(a). *Pavelich*, 229 B.R. at 782.

A contrary holding would provide governmental entities – many of which, like the State Bar, control the livelihoods of debtors promised a fresh start – a back door to violating the discharge injunction. As in *Gruntz* and *McGhan*, such a holding would allow licensing agencies "to rush into friendly courthouses around the nation to garner favorable relief;" the "bankruptcy court would then be stripped of its ability" to exercise its authority to enforce the discharge injunction. *Gruntz*, 202 F.3d at 1083-84.

Given that § 525(a) was enacted to prevent governmental entities from undermining the discharge injunction, and such governmental entities are very often an arm of the State itself, it would stand against reason to allow the State's incorrect determination regarding its own discrimination to prevent the bankruptcy court from enforcing the discharge injunction to its full extent.

Consequently, we hold that the reasoning of *Gruntz* and *McGhan* extends to state court judgments interpreting § 525(a).[9] Because we hold

---

[9] The Panel could find only one case applying the *Rooker-Feldman* doctrine to § 525(a). *Uberoi v. Supreme Ct. of Fla.*, 819 F.3d 1311 (11th Cir. 2016). In *Uberoi*, the Eleventh Circuit Court of Appeals held that a federal district court lacked jurisdiction over a former debtor's § 525(a) claim because she failed to raise § 525(a) as a defense in a prior review of an attorney disciplinary proceeding before the Florida Supreme Court. *Id.* at 1312-13. The *Uberoi* court did not engage in the type of lengthy analysis set forth in *Gruntz* and *McGhan*; in fact, the Eleventh Circuit did not discuss the impact of the discharge injunction at all. We are not bound by the holding in *Uberoi* and, in light of the thorough reasoning in *Gruntz* and *McGhan*, we believe those binding authorities extend to the matter before us.

that we are not constrained by the *Rooker-Feldman* doctrine in this instance, we may address the merits of Debtor's claim under § 525(a).

**B.    The bankruptcy court erred in holding that the disciplinary costs were excepted from discharge under § 523(a)(7).**

As noted above, § 525(a) requires a two-step analysis. First, we must assess if the disciplinary costs were discharged. The bankruptcy court held that the disciplinary costs were excepted from the discharge injunction by operation of § 523(a)(7). "Section 523(a)(7) expressly requires three elements for a debt to be non-dischargeable. The debt must (1) be a fine, penalty, or forfeiture; (2) be payable to and for the benefit of a governmental unit;[10] and (3) not constitute compensation for actual pecuniary costs." *Albert-Sheridan v. State Bar of Cal. (In re Albert-Sheridan)*, 960 F.3d 1188, 1193 (9th Cir. 2020) (citing § 523(a)(7)).

The bankruptcy court did not analyze whether SCR 120, the rule on which the subject disciplinary costs are based, satisfies these elements. Rather, the bankruptcy court appears to have interpreted Circuit authority as creating a *per se* rule that all disciplinary costs imposed in any attorney disciplinary proceeding from any state are excepted from discharge under § 523(a)(7), without the need to assess the applicable state rule providing for such costs. We do not interpret relevant Circuit authorities as creating such a bright line rule.

---

[10] As noted above, the parties do not dispute that the State Bar is a governmental unit, and that the disciplinary costs are payable to it.

### 1. Relevant case law

Any discussion of § 523(a)(7) must begin with the Supreme Court's decision in *Kelly v. Robinson*, 479 U.S. 36 (1986). In *Kelly*, the Court addressed whether a **criminal** restitution award imposed under a Connecticut penal statute was excepted from discharge under § 523(a)(7). *Id.* at 50-53. Prior to engaging in that analysis, the Court spent a considerable portion of its decision discussing the historical reluctance of bankruptcy courts to interfere with state criminal judgments, from the treatment of criminal judgments under the Bankruptcy Act of 1898 through enactment of the Code. *Id.* at 44-46. The Court stressed:

> Our interpretation of the Code also must reflect the basis for this judicial exception, a deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings. The right to formulate and enforce penal sanctions is an important aspect of the sovereignty retained by the States. This Court has emphasized repeatedly "the fundamental policy against federal interference with state criminal prosecutions."

*Id.* at 47 (quoting *Younger v. Harris*, 401 U.S. 37, 46 (1971)).

With this background, the Court acknowledged that "[u]nlike traditional fines, restitution is forwarded to the victim, and may be calculated by reference to the amount of harm the offender has caused." *Id.* at 51-52. In other words, it appeared that restitution did not satisfy two of the elements of § 523(a)(7) because it was not payable to or for the benefit of the government and was calculated to compensate for actual pecuniary

23

loss. Nevertheless, the Court held that neither element "allow[ed] the discharge of a criminal judgment that takes the form of restitution." *Id.* at 52. The Court reasoned:

> The criminal justice system is not operated primarily for the benefit of victims, but for the benefit of society as a whole. Thus, it is concerned not only with punishing the offender, but also with rehabilitating him. Although restitution does resemble a judgment "for the benefit of" the victim, the context in which it is imposed undermines that conclusion. The victim has no control over the amount of restitution awarded or over the decision to award restitution. Moreover, the decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant.
>
> . . . .
>
> Because criminal proceedings focus on the State's interests in rehabilitation and punishment, rather than the victim's desire for compensation, we conclude that restitution orders imposed in such proceedings operate "for the benefit of" the State. Similarly, they are not assessed "for . . . compensation" of the victim. The sentence following a criminal conviction necessarily considers the penal and rehabilitative interests of the State. Those interests are sufficient to place restitution orders within the meaning of § 523(a)(7).

*Id.* at 53. Thus, *Kelly* essentially created an exception to the plain statutory construction of § 523(a)(7) for debts arising from state **criminal** statutes.

After *Kelly*, the Circuit analyzed whether disciplinary costs incurred in an attorney disciplinary proceeding in California were excepted from discharge under § 523(a)(7). *State Bar of Cal. v. Taggart (In re Taggart)*, 249

F.3d 987 (9th Cir. 2001), *superseded by statute*, Cal. Bus. & Prof. Code ("CBPC") § 6086.10(e), *as recognized in Kassas*, 49 F.4th at 1164. In *Taggart*, the Circuit acknowledged that *Kelly* created a broad exception for **penal** sanctions, but held that California's statute governing disciplinary costs in effect at the time was not intended to be penal. *Id.* at 994.

In reaching this decision, the Circuit considered several characteristics of CBPC § 6086.10, the applicable costs statute, including that: (i) a different statute governed the imposition of sanctions that were to be tailored to the misconduct at issue; (ii) the statute denominated the award "costs" whereas the disciplinary statute explicitly referred to fees imposed under that statute as "monetary sanctions;" (iii) the costs were meant to reimburse the State Bar of California for "actual expenses;" (iv) California's disciplinary proceedings were *sui generis* – not governed by either civil or criminal rules of procedure – but the costs statute was analogous to prevailing party fee shifting statutes in civil litigation; and (v) there were no state court opinions or legislative history indicating the statute was meant to be penal. *Id.* at 992-94. These facts led the Circuit to infer that California did not intend for the statute to be penal. *Id.* at 994.

After *Taggart*, the California legislature amended its disciplinary costs statute to add subsection (e), which provides:

> In addition to other monetary sanctions as may be ordered by the Supreme Court pursuant to Section 6086.13, costs imposed pursuant to this section are penalties, payable to and for the benefit of the State Bar of California, a public corporation

25

created pursuant to Article VI of the California Constitution, to promote rehabilitation and to protect the public. This subdivision is declaratory of existing law.

CBPC § 6086.10(e).

In *Findley*, the Circuit considered whether this amendment changed its conclusion from *Taggart*. *See State Bar of Cal. v. Findley (In re Findley)*, 593 F.3d 1048 (9th Cir. 2010). Prior to engaging in its analysis, the Circuit noted that it was **not** revisiting *Taggart*, but only determining "whether the amendments to the statute are sufficient to render the imposed costs non-dischargeable in bankruptcy." *Id.* at 1050.

In holding that the amended statute authorized costs that were excepted from discharge, the Circuit, as in *Taggart*, stressed the importance of looking to the state legislature's intent in imposing the costs. *Id.* at 1052-53. While the *Taggart* panel had to engage in a lengthier analysis of the prior statute to gauge whether the California legislature intended the costs to be penal, the *Findley* panel benefitted from the explicit language in the amended statute, which stated that the costs were "penalties" and meant "to promote rehabilitation and to protect the public." *Id.* at 1052-54.

The Circuit acknowledged that the amended statute "retain[ed] certain structural elements identified in *Taggart* as indicative of a compensatory purpose." *Id.* at 1053. For instance, the amended statute still required reimbursement based on "actual expenses." *Id.* While this would seem to indicate that the costs were "compensation for actual pecuniary

loss," the Circuit, relying on *Kelly*, considered whether the legislature **intended** the statute to be compensatory (as opposed to for rehabilitative or protection purposes). *Id.* at 1052-53, 1053 n.3.[11]

Six years after *Findley*, the Circuit revisited § 523(a)(7). *Scheer*, 819 F.3d 1206. Although *Scheer* did not involve the dischargeability of disciplinary costs, the case is notable as the Circuit's first attempt to limit the reach of *Kelly*:

> The Court's approach in *Kelly*—to untether statutory interpretation from the statutory language—has gone the way of NutraSweet and other relics of the 1980s and led to considerable confusion among federal courts and practitioners about section 523(a)(7)'s scope . . . . It is fair to say that the "I know it when I see it approach" of *Kelly* has led to predictably unpredictable results.

*Id.* at 1210 (citations omitted).

---

[11] Both *Taggart* and *Findley* seemingly collapsed two of the elements of § 523(a)(7) into one. Specifically, the Circuit appeared to treat as mutually exclusive the inquiries into whether a debt is a "fine, penalty, or forfeiture" and whether the debt "is not compensation for actual pecuniary loss." In *Findley*, the Circuit stated the dispute as being over "whether [the debt] constitutes a fine, penalty or forfeiture **or instead** provides compensation for actual pecuniary loss." *Findley*, 593 F.3d at 1051 (emphasis added). In *Taggart*, the Circuit concluded that "such costs are compensation to the State Bar for 'actual pecuniary loss' **rather than** 'fine[s], penalt[ies], or forfeiture[s]." *Taggart*, 249 F.3d at 989 (emphasis added).

This framing was likely inherited from *Kelly*, where the Supreme Court opted to rely on historical exceptions and policy instead of a strict statutory reading, as noted by the dissent in *Kelly*. *Kelly*, 479 U.S. at 55 (Marshall, J., dissenting) (stating that even if the statute at issue was penal in nature it also compensated victims for their injuries and, as a result, qualified as compensation for actual pecuniary loss).

In *Scheer*, the State Bar of California argued that discharging the debt in that case – an arbitration award owed by an attorney to her client – would undermine its power to regulate lawyers. *Id.* at 1211. The Circuit acknowledged that "[s]tates traditionally have exercised extensive control over the professional conduct of attorneys . . . ." *Id.* (quoting *Middlesex Cty. Ethics Comm. V. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982)). Nevertheless, the Circuit believed that "[t]he concerns permitting flexibility in *Kelly* are absent here." *Id.* (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 244–45 (1989)). In referencing the Supreme Court's decision in *Ron Pair Enterprises*, the Circuit highlighted that "*Kelly*'s deviation from the statutory language 'had been animated' by the unique concerns of state criminal proceedings and informed by related pre-Bankruptcy Code practices that 'reflected policy considerations of great longevity and importance.'" *Id.* (quoting *Ron Pair Enters.*, 489 U.S. at 244-45).

With this background, and despite noting its disapproval of the attorney's conduct, the Circuit ultimately held that it "cannot stretch the language of section 523(a)(7) to cover the fee dispute at issue here" because the debt "was purely compensatory." *Id.* The Circuit explained:

> To categorize the fee dispute in this case as nondischargeable simply because the State expresses a strong regulatory interest in a particular industry would render any attorney-client fee dispute nondischargeable. Moreover, the State's logic would extend to fee disputes in any closely regulated industry— doctors, dentists, chiropractors, barbers, locksmiths, real estate agents, acupuncturists, tattoo artists, and so on. We require

clearer language in section 523(a)(7) before we can endorse such an incremental yet horizonless approach—otherwise, we will end up boiling a frog that Congress never intended to leave the lily pad.

*Id.*

The Circuit followed this decision with *Albert-Sheridan*. 960 F.3d 1188. There, the Circuit assessed the dischargeability of two debts: (i) disciplinary costs incurred pursuant to CBPC § 6086.10; and (ii) discovery sanctions ordered by a California superior court. *Id.* at 1192. Regarding the disciplinary costs, the Circuit stated that they were bound by their decision in *Findley*, which had addressed the dischargeability of awards under the very same statute – CBPC § 6086.10. *Id.*

With respect to the discovery sanctions, the Circuit believed the plain language of § 523(a)(7) disposed of the issue. *Id.* at 1193. Because the applicable statute provided for sanctions to be paid to "anyone" incurring an expense, the Circuit held that the statute did not satisfy § 523(a)(7)'s requirement that the debt be payable to a governmental entity. *Id.* The Circuit also held that the sanctions constituted "compensation for actual pecuniary costs" because the amount of the sanctions reflected the costs incurred responding to the misuse of the discovery process. *Id.* at 1194.

In reversing this Panel's holding that the discovery sanctions were exempt under *Kelly*, the Circuit again cautioned against too broad an application of the holding in *Kelly*:

29

Given that *Kelly* was based on a "deep conviction" rather than statutory language, we have raised concerns that it has "led to considerable confusion among federal courts and practitioners about section 523(a)(7)'s scope." *In re Scheer*, 819 F.3d 1206, 1210 (9th Cir. 2016) (collecting cases). We further compared *Kelly*'s approach of "untether[ing] statutory interpretation from the statutory language" to a "relic[ ] of the 1980s." *Id.* Like other relics of the 1980s, such as big hair, jam shorts, and acid-wash jeans, *Kelly*'s atextual interpretative method should not come back into fashion. Thus, we have sought to cabin *Kelly*'s reach and refused to expand its rationale to an arbitration award requiring an attorney to refund a client's funds. *Id.* at 1211. We have also declined to extend *Kelly* to except criminal restitution payments under the Code's preference statute, 11 U.S.C. § 547(b). *In re Silverman*, 616 F.3d 1001, 1007–08 (9th Cir. 2010).

. . . .

Indeed, the Supreme Court has consistently reminded us of our duty to follow the law as enacted by Congress, not as judged by our convictions. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010) ("We must enforce plain and unambiguous statutory language according to its terms."); *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989) ("Our task is to apply the text, not to improve upon it."). This command does not change when the matter involves bankruptcy. "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Accordingly, when it comes to interpreting the Code, we are not at liberty to "alter the balance struck by the statute." *Czyzewski v. Jevic Holding Corp.*, –— U.S. ——, 137 S. Ct. 973, 987, 197 L.Ed.2d 398 (2017) (simplified). Accordingly, we are bound to follow the plain meaning of § 523(a)(7) here.

*Id.* at 1195.

Finally, the Circuit recently analyzed § 523(a)(7) in *Kassas*, on which the bankruptcy court relied in holding that the disciplinary costs in this case were excepted from discharge. *Kassas*, 49 F.4th 1158. As in *Albert-Sheridan*, the *Kassas* court noted that *Findley*'s holding regarding disciplinary costs incurred **under California law** was binding precedent. *Id.* at 1166. Thus, neither *Kassas* nor *Albert-Sheridan* added to the analysis of disciplinary costs assessed under CBPC § 6086.10 set forth in *Findley*.

Nevertheless, *Kassas* is instructive; there, the debtor committed several violations of the CBPC and the Rules of Professional Conduct and was disbarred. *Id.* at 1162. In its order disbarring the debtor, the California Supreme Court ordered that any restitution owed to the Client Security Fund ("CSF") may be enforced against the debtor pursuant to CBPC § 6140.5. *Id.*

In California, the CSF was created to reimburse applicants who had suffered pecuniary loss as a result of dishonest conduct from attorneys. *Id.* at 1161. Once the CSF paid applicants, the State Bar of California became subrogated to the rights of the applicant and pursued attorneys for reimbursement to the CSF. *Id.* Under the applicable California statute, disbarred attorneys were required to reimburse the CSF as a condition to reinstatement. *Id.* at 1162. The statute also provided that the obligation to reimburse the CSF could be enforced as a money judgment. *Id.*

After reviewing the California statute, the Circuit held that the debt owed to the CSF was dischargeable. *Id.* at 1166. The holding was based exclusively on the fact that the statute was compensatory; thus, the Circuit did "not need to reach the question whether the California Supreme Court's order that [the debtor] repay the CSF is a fine or penalty, because . . . the restitution payments at issue" were "compensation for actual pecuniary loss." *Id.* at 1164 (citing *Albert-Sheridan*, 960 F.3d at 1193 n.3) ("Because the discovery sanctions do not meet the governmental unit or non-compensatory elements, we need not address whether they are also fines, penalties, or forfeitures under the Code.").[12]

The Circuit supported its holding that the debt was "compensation for actual pecuniary loss" with the following facts: (i) the stated purpose of the CSF was to relieve or mitigate pecuniary losses caused by dishonest conduct; (ii) reimbursement was limited to loss of money or property and excluded interest and consequential losses; (iii) the amount of pecuniary loss was determined after a deliberative process overseen by the CSF Commission; (iv) the reimbursement payments were precisely calculated, unlike the criminal restitution payments in *Kelly*; and (v) the State Bar had a right of subrogation, which made the program similar to classic insurance. *Id.* at 1164-65.

---

[12] Unlike *Taggart* and *Findley*, this language reflects the Circuit's attempt to steer the discussion back towards the plain statutory language of § 523(a)(7) by giving effect to each of the three distinct elements of § 523(a)(7) instead of collapsing the first and third elements into one element.

Thus, the Circuit held that, "even if reimbursement serves some penal or rehabilitative purpose, we conclude that any reimbursement to the CSF is payable to and for the benefit of the State bar and is compensation for the CSF's actual pecuniary loss." *Id.* at 1166.

As is evident from the discussion above, while the post-*Kelly* case law interpreting § 523(a)(7) continues to evolve, one point remains clear: the authorities do not provide a bright line rule regarding whether disciplinary costs, or any debts, are *per se* excepted from discharge simply because they arise in the context of an attorney disciplinary proceeding.

Nevertheless, we can discern some general guidelines from the Circuit's decisions. First, under *Findley*, where the legislature amends a statute explicitly to provide that **the specific statute** is enacted for a penal purpose, costs imposed under that statute are excepted from discharge. Yet, the Circuit was careful to note that *Findley* did not overrule *Taggart*; rather, *Findley* simply addressed whether the amended California statute compelled a different result from the one reached in *Taggart*.

Second, in the absence of state criminal justice interests that concerned the Supreme Court in *Kelly*, the Circuit has gradually "cabin[ed] *Kelly*'s reach" and directed courts towards the plain statutory language of § 523(a)(7).

Third, the Circuit's most recent cases give effect to each element of § 523(a)(7) by analyzing if the debt is a "fine, penalty, or forfeiture" **and** whether it is "not compensation for actual pecuniary loss." If **either**

element is not satisfied, the Circuit has held the debt to be dischargeable. In connection with this analysis, the post-*Findley* cases appear less concerned with the state's intent in imposing a debt and more focused on whether the debt objectively compensates the government for actual pecuniary loss. Using these general principles, we may proceed to assess whether SCR 120 is excepted from the discharge pursuant to § 523(a)(7).

### 2. Application of case law to SCR 120

The SCN imposed disciplinary costs against Debtor pursuant to SCR § 120(1) and 120(3), which provides:

1. An attorney subjected to discipline or seeking reinstatement under these rules shall be assessed the costs, in full or in part, of the proceeding, including, but not limited to, reporter's fees, investigation fees, witness expenses, service costs, publication costs, and any other fees or costs deemed reasonable by the panel and allocable to the proceeding.
   . . . .
3. In addition to any costs assessed as provided for herein, an attorney subjected to discipline shall be assessed administrative costs allocable to the proceeding, but in any case, shall not be less than the following amounts:
   Admonition: $750
   Reprimand: $1,500
   Suspension: $2,500
   Disbarment: $3,000

SCR § 120(1), 120(3).

Unlike the current version of CBPC § 6086.10, SCR 120 does not include explicit language referring to costs imposed under the rule as

"penalties" or stating that such costs are intended to "promote rehabilitation and to protect the public." To reach its conclusion that the disciplinary costs were excepted from discharge, the bankruptcy court instead relied on the Conditional Reinstatement Order, noting that "whatever may be the Nevada Court's interpretation of [SCR] 120 or any other interpretation of the purpose of the requirement to pay the disciplinary costs . . . is not subject to review by this court."

As further discussed below, the SCN did not interpret SCR 120 in the Conditional Reinstatement Order. The SCN also did not discuss or interpret § 523(a)(7). The SCN instead analyzed Debtor's claim under § 525(a), which analysis conflicted with the Supreme Court's holding in *NextWave*, 537 U.S. at 301-02.[13] However, even if the SCN had interpreted SCR 120 for purposes of analyzing nondischargeability under § 523(a)(7), the outcome would not be as obvious as the bankruptcy court apparently believed.

As a preliminary matter, we believe it is worth noting that the rules governing disciplinary proceedings in Nevada emanate from a different authority and are enacted in a different manner than the statutes governing disciplinary proceedings in California. In California, the state legislature passes the statutes governing attorney disciplinary proceedings, including the imposition of costs. Although the Supreme Court of California, like the

---

[13] We discuss the SCN's interpretation of § 525(a) in section C.

SCN, has the final say on disciplinary decisions rendered by the State Bar of California, the statutes under which the California Supreme Court proceeds are written and amended by an independent legislature, presumably based on the will of the people of California.

In Nevada, on the other hand, the SCN creates and amends the rules governing the legal profession. *See* SCR 39. In other words, the entity that issues final decisions enforcing disciplinary rules in Nevada is the same entity that passes the rules in the first place.

It is unclear if the differences between California and Nevada would be sufficient to place SCR 120 beyond the holding of *Findley*. In *Findley*, the Circuit deferred to California's legislature, i.e., the most obvious entity that represents the will of the people. In this case, the Circuit's holding in *Scheer* – that debts should not be deemed nondischargeable simply because the state expresses a strong regulatory interest in an industry – raises questions regarding whether the same deference should apply to the SCN. *See Scheer*, 819 F.3d at 1211. On the one hand, if the people of Nevada organized their government to delegate all issues related to attorney discipline to the SCN, one could argue that the SCN's rules should have equal force to a legislature's statutes. On the other hand, the Circuit's concerns in *Scheer* are heightened where a governmental entity like the SCN writes **and** enforces the applicable rules. Given that the Ninth Circuit has held that federal courts are not bound by inaccurate interpretations of the discharge injunction by state courts, *McGhan*, 288 F.3d at 1180, it would seem

counterintuitive to allow state courts to evade the discharge injunction simply by amending their own rules.

In any event, we need not reach these issues because a careful reading of the Conditional Reinstatement Order demonstrates that the SCN did not interpret SCR 120 at all. The SCN merely stated that "[t]he primary purposes of attorney discipline are to promote an attorney's rehabilitation, deter misconduct, and protect the public." This **general** statement about why states discipline attorneys did not reference SCR 120, nor did the SCN rely on any authorities interpreting the purpose of SCR 120. Rather, the SCN referenced four cases in support of this contention, only one of which is a Nevada case about Nevada law. *See Claiborne*, 104 Nev. 115. In *Claiborne*, the SCN had merely stated that the purpose of disciplinary proceedings is to protect the public and maintain public confidence in the bar. *Id.* at 224. *Claiborne* was completely silent as to SCR 120 and did not involve the assessment of disciplinary costs.

The other three cases on which the SCN relied were federal or California authorities analyzing disciplinary costs under California and Pennsylvania law for purposes of determining dischargeability under § 523(a)(7) or discrimination under § 525(a). None of those authorities had anything to say about SCR 120.

As noted above, the Circuit requires analysis of the **specific statute** that generates the debt. Absent such requirement, the Circuit would have created a bright line rule making all debts stemming from attorney

37

disciplinary proceedings nondischargeable. That is not the law; in fact, as is evident from the discussion of relevant authorities above, the Circuit has held that certain debts arising from attorney disciplinary proceedings are dischargeable. *See, e.g. Kassas*, 49 F.4th at 1166. Thus, the Conditional Reinstatement Order is not helpful to our analysis of § 523(a)(7).

The SCN has never analyzed SCR 120 in any detail. Nor can we benefit from an analysis by intermediate courts – in Nevada, decisions of the State Bar are automatically reviewed by the SCN. Moreover, unlike the costs statute at issue in *Findley*, SCR 120 does not contain any language indicating that costs imposed under the rule are meant to be penalties, or that the rule is meant to serve a penal purpose, such as rehabilitation or protection of the public. Finally, the State Bar has not provided, nor have we found, any relevant legislative history or state treatises that might guide our analysis. As such, contrary to the bankruptcy court's conclusion, there currently is no state court interpretation of SCR 120 to which we are bound or from which we can be persuaded.

Consequently, we are left with our own interpretation of the plain language of § 523(a)(7) and SCR 120 as directed by the Circuit authorities referenced above. Those authorities compel us to hold that the disciplinary costs incurred under SCR 120 are dischargeable.

First, as in *Taggart*, we note that the structure of the SCRs does not indicate that either SCR 120(1) or 120(3) is a "fine, penalty, or forfeiture." A separate rule, SCR 102, governs the issuance of "sanctions." SCR 102 does

not identify "costs" as a form of "sanctions." Evidently, the drafters differentiated between punitive measures, which they called "sanctions," and "costs."

In addition, the costs imposed under SCR 120 bear the classic hallmarks of compensation. With respect to SCR 120(1), the rule calls for assessment of costs by reference to an itemized bill "**allocable to the proceeding**." (Emphasis added). Although SCR 120(3) provides for a flat fee based on the severity of the sanction imposed on the attorney, the drafters took care to refer to costs imposed under this subsection as "administrative costs **allocable to the proceeding** . . . ." (Emphasis added). Aside from the compensatory intent that may be inferred from the phrase "allocable to the proceeding," the drafters' decision to qualify the word "costs" with the word "administrative" also hints at a compensatory aim.

In addition, whereas sanctions in Nevada appear discretionary – in the Conditional Reinstatement Order, the SCN weighed four factors to tailor the punishment to Debtor's misconduct – costs are mandatory. SCR 120 states that attorneys subject to discipline or seeking reinstatement "**shall** be assessed" the costs under SCR 120(1) and 120(3). (Emphasis added). And, whereas California's system of disciplinary proceedings is *sui generis*, Nevada's system provides that, unless explicitly provided otherwise in the SCRs, "the Nevada Rules of **Civil** Procedure . . . apply in disciplinary cases." SCR 119(5) (emphasis added).

39

Moreover, although there are no Nevada cases interpreting SCR 120, one recent case by the SCN is instructive. *Matter of Discipline of Errico*, 134 Nev. 955 (2018). In *Errico*, the SCN considered whether SCR 102 allowed for the imposition of restitution in cases where the attorney is being disbarred. *Id.* at *2. The SCN first noted that "restitution is a recognized form of attorney discipline for misconduct involving misappropriation of client property" and "serves the purpose of attorney discipline to protect the public and the profession by showing the attorney's rehabilitation and fitness to resume or continue the practice of law." *Id.*

Nevertheless, the SCN believed restitution was not appropriate where the attorney was being permanently disbarred:

> But when disbarment is permanent, as it is in Nevada, imposing additional forms of discipline does not further the purpose of attorney discipline—the public and profession are fully protected because the attorney is permanently removed from the practice of law, making rehabilitation irrelevant . . . . Considering that SCR 102 does not provide for restitution in conjunction with permanent disbarment and that restitution does not further the purpose of attorney discipline when an attorney has been permanently disbarred, we cannot impose the recommended restitution in this matter regardless of the parties' stipulation as to the amount of restitution.

*Id.* Despite holding that "additional forms of discipline," such as restitution under SCR 102, should not be imposed in cases of permanent disbarment, the SCN ordered the attorney to pay "administrative costs . . . as provided

40

in SCR 120(3), plus any costs for the disciplinary proceeding as specified in SCR 120(1) and set forth in the State Bar's Memorandum of Costs. . . ." *Id.*

The SCN's decision in *Errico* clearly indicates that the SCN does not interpret SCR 120 as serving a penal purpose. In fact, the Conditional Reinstatement Order entered in Debtor's case bolsters this conclusion: the SCN allowed Debtor to return to the practice of law despite Debtor's failure timely to pay the disciplinary costs, further indicating that concerns about protecting the public are divorced from the payment of costs. The plain statutory language of both § 523(a)(7) and SCR 120 similarly lead to the conclusion that SCR 120 is not penal, and is meant as compensation for actual pecuniary loss.

Exceptions to discharge are meant to be narrowly construed. *Kawaauhau v. Geiger*, 523 U.S. 57, 58 (1998). Given the Circuit's recent limitation of *Kelly* to judgments stemming from criminal statutes, and because the plain language of § 523(a)(7) excludes debts that are compensation for actual pecuniary loss, we hold that the disciplinary costs imposed on Debtor were discharged.

**C.  The bankruptcy court erred in holding that the State Bar did not violate § 525(a).**

Having held that the disciplinary costs were dischargeable, we must next address if the State Bar's refusal fully to reinstate Debtor was based "solely" on Debtor's failure to pay disciplinary costs. The bankruptcy court held that it was not, based on two observations: first, because the SCN

41

imposed some of the disciplinary costs before Debtor filed for bankruptcy and, second, because the SCN imposed costs "to promote an attorney's rehabilitation, deter misconduct, and protect the public." We hold that neither of these points defeats Debtor's § 525(a) claim.

As to the first point, while the bankruptcy court is correct that the two suspension orders were entered prepetition, the Conditional Reinstatement Order continues to require payment on the disciplinary costs awarded pursuant to those orders after the discharge. While the costs may not have been imposed because Debtor was in bankruptcy, § 525(a) also prohibits discrimination on the basis that a debtor "has not paid a debt that is dischargeable." Obviously, discrimination on this basis cannot arise until after a debt is discharged, and it is this prong of § 525(a) that forms the basis of Debtor's claim.

To the extent the bankruptcy court believes there is a causation issue because some of the debt arose before Debtor was bankrupt, the bankruptcy court's interpretation would write § 525(a) out of existence because **all** discharged debts are prepetition debts. Thus, the timing issue raised by the bankruptcy court is not a basis to deny Debtor relief under § 525(a).

The bankruptcy court's second basis for denial of relief, that the costs were imposed "to promote an attorney's rehabilitation, deter misconduct, and protect the public," contradicts the Supreme Court's holding in *NextWave*, 537 U.S. at 301-02. In *NextWave*, the Supreme Court decided

42

whether § 525(a) prohibited the Federal Communications Commission (the

"FCC"), i.e., a governmental entity, "from revoking licenses held by a

debtor in bankruptcy upon the debtor's failure to make timely payments

owed to the Commission for purchase of the licenses." *Id.* at 295. Like the

State Bar, the FCC argued that the debtor's failure to make payments was

not the sole reason for cancellation of the licenses; rather, the FCC stated

that it had a "valid regulatory motive" for the cancellation. *Id.* at 301.

The Supreme Court rejected this argument, calling the FCC's

regulatory motive "irrelevant." *Id.*

> When the statute refers to failure to pay a debt as the sole cause
> of cancellation ("solely because"), it cannot reasonably be
> understood to include, among the other causes whose presence
> can preclude application of the prohibition, the governmental
> unit's *motive* in effecting the cancellation. Such a reading would
> deprive § 525 of all force. It is hard to imagine a situation in
> which a governmental unit would not have some further
> motive behind the cancellation—assuring the financial solvency
> of the licensed entity, *e.g., Perez v. Campbell,* 402 U.S. 637, 91
> S.Ct. 1704, 29 L.Ed.2d 233 (1971); *In re The Bible Speaks,* 69 B.R.
> 368, 374 (Bkrtcy. D. Mass. 1987), or punishing lawlessness, *e.g.,*
> *In re Adams,* 106 B.R. 811, 827 (Bkrtcy. D.N.J. 1989); *In re Colon,*
> 102 B.R. 421, 428 (Bkrtcy. E.D. Pa. 1989), or even (quite simply)
> making itself financially whole. Section 525 means nothing
> more or less than that the failure to pay a dischargeable debt
> must alone be the proximate cause of the cancellation—the act
> or event that triggers the agency's decision to cancel, whatever
> the agency's ultimate motive in pulling the trigger may be.
>
> Some may think (and the opponents of § 525 undoubtedly
> thought) that there *ought* to be an exception for cancellations

that have a valid regulatory purpose. Besides the fact that such an exception would consume the rule, it flies in the face of the fact that, where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly, rather than by a device so subtle as denominating a motive a cause.

*Id.* at 301-02 (emphases in original).

Here, the SCN and the bankruptcy court relied on the State Bar's regulatory motives – promoting attorneys' rehabilitation, deterring misconduct, and protecting the public – to deny Debtor's § 525(a) claim. Under the holding of *NextWave*, this was error.

The record is unclear regarding the status of Debtor's reinstatement. It appears Debtor's probationary period would have ended in February 2024, and Debtor was required to have paid the disciplinary costs by that time. To the extent the only barrier to Debtor's reinstatement is payment of the disciplinary costs, the State Bar has violated § 525(a). If there are other reasons preventing Debtor from full reinstatement – such as failure to comply with the SCN's mentorship and accounting requirements – denial of reinstatement would not be based "solely" on payment of a discharged debt and, as a result, would not run afoul of § 525(a). On remand, the bankruptcy court should assess whether the State Bar violated § 525(a) using the standard provided herein.

## CONCLUSION

For the reasons set forth above, we REVERSE the bankruptcy court's ruling and REMAND with instructions to the bankruptcy court to assess Debtor's § 525(a) claim under the standards set forth herein.